# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

```
====================================
MARK S. BONCHEK,                      :
                                      :
                    Plaintiff,        :
                                      :
      vs.                             :
                                      :
NICOLET UNIFIED SCHOOL DISTRICT,      :
NICOLET HIGH SCHOOL,                  :
6701 North Jean Nicolet Road          :
Glendale, Wisconsin 53217,            :   PLAINTIFF MARK S. BONCHEK'S
                                      :   COMPLAINT AND JURY DEMAND
ESTATE OF DAVID R. JOHNSON,           :
ORREN J. BRADLEY, former President of :
  the NICOLET SCHOOL BOARD,           :
GERALD T. HAIG, former Vice-President of :
  the NICOLET SCHOOL BOARD,           :   Civil Action No._____
ESTATE OF WILLIAM M. HUEGEL, former   :
  Treasurer of the NICOLET SCHOOL BOARD,:
MYRA TAXMAN, former Clerk of          :
  the NICOLET SCHOOL BOARD,           :
WILLIAM R. HEISER, former Member of   :
  the NICOLET SCHOOL BOARD,           :
ROBERT STRAUSS, former Member of      :
  the NICOLET SCHOOL BOARD,           :
ESTATE OF JAMES O. REIELS, a former   :
  Administrator of Nicolet School District, and :
JOHN DOES 1 – 100,                    :
                                      :
                    Defendants.       :
====================================
```

## I. INTRODUCTION

1)      Sadly, the sordid tale of sexual abuse of children goes on, with another perpetrator having satisfied his sick, sexual fantasies, while destroying the lives of children in his care. Once again, the sexual perpetrator was enabled by those adults in power, who covered up and fraudulently concealed the deviant sexual misconduct of their employee, and breached the duty of trust that society demands for the protection of children.

1

2)      The facts are not in dispute:

-       David R. Johnson, a past Chairman of the Math and Science Departments at Nicolet High School, molested and sexually abused boys and young teens.

-       The men and women of the Nicolet School Board - who were responsible for the protection of these innocent victims - not only did nothing, but covered it up and fraudulently hid Johnson's sexual abuse.

-       The victims were brushed aside, by Nicolet High School, and by leaders who preferred to protect the abuser and their institutions.

-       The primary objective was not to help children, but to avoid scandal to Nicolet and harm to the careers of the Nicolet Board, staff, Nicolet Defendants and the John Does.

-       The Nicolet School Board, including the Board Officers and Members, had actual knowledge of this conduct and yet, the sexual deviant was routinely placed in classrooms and extra-curricular activities, while Nicolet was on notice that a complaint of child sexual abuse had been made.

-       While conducting their own deficient, biased investigation into the crimes against children, the Nicolet administrators allegedly reported the sexual abuse to the authorities but, expressly and/or implicitly, agreed with law enforcement to terminate or avoid a true or thorough investigation.

-       After receiving the report of sexual abuse against children, law enforcement failed to undertake any appropriate investigation, and/or by terminating it without enforcing the law for the protection of minors in the Nicolet community.

-       After receiving notice of Johnson's deviant misconduct, Nicolet continued to fraudulently praise and promote Johnson as a leader at Nicolet and cited his receipt of the 1983 Presidential Award for Excellence in Mathematics Teaching, by President Ronald Reagan, and other Awards and honors bestowed upon Johnson.

-       This conduct fraudulently concealed the sexual abuse of young boys and enabled Johnson to continue to endanger the welfare of children. The current Nicolet administration determined that Nicolet and the Nicolet Defendants "clearly should have done much more to protect Nicolet students after being made aware of … Johnson's conduct."

-       Above all else, Nicolet protected its institution and the Board and staff at all costs, while destroying the lives of the innocent victims.

2

3)      The Plaintiff, Mark S. Bonchek (hereinafter "Bonchek"), respectfully submits this Complaint and Demand for Jury Trial (hereinafter the "Complaint"). The Plaintiff is a victim of Johnson's sexual attacks and the fraud, deceit, misrepresentations and cover-up of Nicolet. Bonchek was victimized by the sexual abuse of David R. Johnson (hereinafter "Johnson") and the reckless and wanton conduct of the Nicolet Defendants, as defined herein, who breached their duty of trust to protect the children in their care, and fraudulently covered up the molestation by Johnson.

4)      The Plaintiff further alleges that, as a result and as caused by Defendant Johnson's sexual abuse, and the negligence, gross negligence and reckless and wanton conduct of Nicolet, the Nicolet Defendants and/or the John Does, the Plaintiff has suffered decades of mental and emotional trauma and distress, a loss of self-esteem, pain and suffering, physical manifestations, and loss of earning capacity, with therapy and medical and/or health-related expenses, in excess of $75,000.00, and together with costs, attorneys' fees and interest.

5)      The Plaintiff respectfully requests that his action proceed to a trial by jury, that a judgment be entered on all Counts against the Defendants, jointly and severally, and that the Defendants be ordered to pay the Plaintiff his compensatory and general damages, in excess of $75,000.00, together with costs, interest, multiple and/or punitive damages, reasonable attorneys' fees, and any such other relief as this Honorable Court deems just and appropriate.

## II. <u>PARTIES</u>

6)      At all times relevant herein, the Plaintiff, Mark S. Bonchek, is an adult and a resident of the Commonwealth of Massachusetts.  In the late 1970's and early 1980's, the Plaintiff was a student of Nicolet High School, graduating as the valedictorian in the spring of 1982.

Bonchek was a young teenager at the time of his victimization by the sexual exploitation and sexual abuse by Johnson and the Defendants, as alleged herein.

7)    Between in or about 1958 and in or about 1991, and at all times relevant herein, Defendant Johnson was a math teacher, employed by Nicolet High School.  While at Nicolet, Johnson was a Chairman of the Math and Science Departments and the recipient of the 1983 Presidential Award for Excellence in Mathematics Teaching. The Defendant was a member of the Wisconsin Mathematics Council, the National Council of Teachers of Mathematics and the National Council of Supervisors of Mathematics.  During the relevant time, Johnson was the teacher advisor for Nicolet clubs known as the "Hosts," and the "Magic Company," using these extra-curricular activities as a vehicle for his enticement, coercion and entrapment of young boys into a cycle of sexual abuse and exploitation, while using the Nicolet High facilities for his deviant conduct towards minors.  On or about March 28, 2018 and after the revelation of his decades of sexual abuse at Nicolet, David R. Johnson committed suicide and his Estate is a Defendant in this litigation.

8)    Upon information and belief and during the relevant time period, the Defendant, the Nicolet Unified School District and Nicolet High School (hereinafter "Nicolet"), is the municipal governmental organization which owns and operates the sole high school in the area. Nicolet claims to have the following mantra as its guiding principle, "*Accelerating Achievement - Every Student, Every Classroom, Every Day.*" Unfortunately, the Defendant's fraud and fraudulent concealment has demonstrated that its guiding principle was a Potemkin village, as the facade collapsed upon itself. Between in or about 1958 and 1991, Defendant Nicolet was the employer of Johnson, and for decades beginning no later than the early 1980's, enabled and fraudulently covered up his sexual abuse and exploitation of young boys, including Bonchek.  By no later than

4

the early 1980's, Nicolet had actual notice, arising from a complaint of sexual exploitation, of Johnson's molestation of young boys in their care. In direct contravention of its duty of care, the Defendant fraudulently covered up the Johnson crimes and fraudulently praised and promoted his alleged credentials and awards to the Nicolet community and others.

9)     Upon information and belief, between in or about 1978 and/or 1983 and/or thereafter, Defendant Orren J. Bradley (hereinafter "Bradley") was the President of the Nicolet School Board.  With the other Members of the School Board, upon information and belief, Defendant Bradley was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Bradley's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

10)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Gerald T. Haig (hereinafter "Haig") was the Vice-President of the Nicolet School Board.  With the other Members of the School Board, upon information and belief, Defendant Haig was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Haig's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

5

11)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant William M. Huegel (hereinafter "Huegel") was the Treasurer of the Nicolet School Board. With the other Members of the School Board, upon information and belief, Defendant Huegel was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Huegel's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson. Upon information and belief, on or about January 16, 2011, William M. Huegel passed away.

12)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Myra Taxman (hereinafter "Taxman") was the Clerk of the Nicolet School Board. With the other Members of the School Board, upon information and belief, Defendant Taxman was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Taxman's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

13)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant William R. Heiser (hereinafter "Heiser") was a Member of the Nicolet School Board. With the other Members of the School Board, upon information and belief, Defendant Heiser was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then

fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Heiser's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

14) Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Robert Strauss (hereinafter "Strauss" and collectively, with Bradley, Haig, Huegel, Taxman and Heiser, thereinafter the ""Nicolet Board Members" or the "Board Members") was a Member of the Nicolet School Board. With the other Members of the School Board, upon information and belief, Defendant Strauss was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Strauss's tenure on the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

15) Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant James O. Reiels (hereinafter "Reiels") was the Administrator of the Nicolet School District (collectively, with the Defendant Board Members and with Defendant Nicolet, hereinafter as the "Nicolet Defendants"). Upon information and belief, in or about 1959, Reiels joined Nicolet as a teacher and in or about 1974, became District Administrator. With the Members of the School Board, upon information and belief, Defendant Reiels was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Reiels' tenure on the School and

7

thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson. Upon information and belief, on or about October 23, 2016, James O. Reiels passed away.

16)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant John Does 1 - 100 (hereinafter the "John Does" or the "Does") were persons and/or employees, whether teachers, staff and/or other authorized agents of the Nicolet School District, who knew, or should have known, of the sexual exploitation and abuse by Defendant Johnson of innocent young boys at Nicolet. With the Members of the School Board, upon information and belief, Defendant Does knew, or should have known, of the sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During the tenure of certain John Does at the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

### III. JURISDICTION AND VENUE

17)     The Plaintiff asserts that this Honorable Court has jurisdiction over this action under 28 U.S.C. § 1332 because the Parties are of complete diversity, in that the Plaintiff is a resident and citizen of the Commonwealth of Massachusetts and each Defendant, upon information and belief, is a citizen of the State of Wisconsin, and that the amount in controversy exceeds $75,000.00.

18)     The Plaintiff further contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Wisconsin in that, such District is where the Plaintiff was sexually abused

Case 2:19-cv-00425   Filed 03/25/19   Page 8 of 45   Document 1

by Defendant Johnson, is where Defendant Nicolet is located and headquartered, and is where the fraudulent concealment, the breach of trust and enforcement of the law by the Defendants, the fraudulent puffery of Johnson, and the other violative conduct described herein is alleged to have occurred.

19)     This Court has personal jurisdiction, generally and specifically, over the Defendants as arising from their residence and principal headquarters within the District, generally over time and specifically in their dealings with the Plaintiff, within the State of Wisconsin.

### IV. FACTUAL BACKGROUND

20)     The Plaintiff alleges that the following facts, without limitation, give rise to his claims for relief:

21)     Between at least the 1950's and the present time, including but not limited to the relevant time period, Nicolet had established itself as a high school for elite and exceptional students in the State of Wisconsin. The Nicolet High School has sought to create an image of itself as a bastion for educating the children of professionals and the elite in the greater metropolitan Milwaukee, resulting in the School claiming many prominent citizens of Wisconsin as alumni/ae. Its curriculum has generally followed that of the "Enlightenment" model, which holds the "classics" to be the basis of an educated mind.

22)     As a high-performing and well-regarded school, Nicolet High School has had an advanced placement program that includes calculus (AB and BC), statistics, computer science, physics (mechanics and electromagnetism), chemistry, biology, environmental science, English language and composition, French language, Spanish language, Spanish literature, German language, music theory, American history, European history, macro-economics, micro-economics, studio art (drawing, 2D, 3D), and American government. During the relevant time period and upon

9

information and belief, Nicolet generally committed to spend more money per student than other comparable high schools in the State of Wisconsin.

23)    Nicolet High School has been named to the "*Blue Ribbon School of Excellence*," the U.S. Department of Education's highest award and in or about 2008, was listed as one of the fifty (50) best schools in Wisconsin by *U.S. News and World Report,* in an assessment of more than 20,500 public high schools from 50 states and the District of Columbia by the magazine.

24)    In or about 1958, Nicolet hired Defendant Johnson as an instructor and teacher in the Mathematics Department at the Nicolet High School and thereafter as the Chairman of the Mathematics / Science Department and Administrative Supervisor of the Mathematics and Science Personnel at Nicolet.  Johnson allegedly had sterling credentials, having a Master of Science degree from the University of Wisconsin, and was considered an exceptional addition to the teaching staff and especially the Mathematics Department at Nicolet.

25)    Over the decades, Johnson made a name for himself as an innovator and leader in teaching methodologies of mathematics.  The Defendant was an active member in various professional organizations, having become Editor of the *Wisconsin Mathematics Teacher* publication and as President of the Wisconsin Mathematics Council. The Defendant was active in the National Council of Teachers of Mathematics (hereinafter the "NCTM"), serving as Chairman, Vice-Chairman and member of various committees and on the NCTM Board of Directors. Johnson was also active in the National Council of Supervisors of Mathematics (hereinafter the "NCSM"), serving as President, North Central Regional Director and committee member over the years.

26)    Between in or about 1977 and 1994, Defendant Johnson was the author of a number of articles and publications, including, *inter alia*, the 1977 NCTM edition of "*Guidelines for the Tutor of Mathematics*," the 1982 publications entitled "*Mathematics Contests – A Handbook for*

10

*Mathematics Educators*," by NCTM and entitled "*Every Minute Counts: Making Your Math Class Work*," by Seymour Publications in Palo Alto, California.

27)     Upon information and belief, between 1958 and early 1980's, Nicolet, the Nicolet Defendants and the John Does promoted the education, skills, expertise, awards and activities of Defendant Johnson in the Nicolet community and particularly the media, including but not limited to the Glendale Herald and in the Nicolet yearbook, entitled "*Shield*." *See* Article from *Shield*, dated 1979, attached, restated and incorporated by reference herein as **Exhibit A**.

28)     For example, in the April 8, 1982 Glendale Herald, Nicolet, the Nicolet Defendants and the John Does touted the math publications of Johnson and his alleged expertise in the field, which stated, in pertinent part, as follows:

> "A textbook of mathematics teaching methods and a handbook on mathematics contests for educators have been written by Nicolet High School instructors.

> David R. Johnson, chairman of the Nicolet mathematics department, and supervisor of personnel of Nicolet High School, has written "*Every Minute Counts: Making Your Math Class Work*." The book has been published by Dale Seymour Publications, Palo Alto, Calif.

> The textbook of teaching methods for the secondary mathematics teacher is designed for the beginner as well as the experienced professional and can be used for college courses and teacher inservice [sic] programs.

> Johnson is a member of the mathematics coordinating committee for the middle schools in the district. Teacher [sic] frequently observe his classroom techniques. In 1968, he received the Society of Engineering Institutes award for outstanding mathematics teacher, and, in 1975, he received a "Professor for the Day Award" from the University of Wisconsin-Oshkosh. He is a member of national mathematics associations and is a nationally-known speaker in his field. He has written several articles in mathematics publications.

> Another new book that Johnson has written with Nicolet mathematics instructor … is '*A Handbook on Mathematics Contests for Mathematics Educators.*' The book has been published by the National Council of Teachers of Mathematics, Washington, D.C.

11

The book provides models for designing mathematics contests for students from elementary to college levels.

Johnson is also mathematics resource coordinator for Nicolet and adjunct instructor of mathematics for Lakeland College and has spoken at national mathematics associations meetings regarding a new approach to teach calculus."

*See* Glendale Herald Article, dated April 8, 1982, attached, restated and incorporated by reference herein as **Exhibit B**; *see also* Glendale Herald Article, dated March 1983, attached, restated and incorporated by reference herein as **Exhibit C**.

29)    Upon further information and belief, Nicolet, the Nicolet Defendants and the John Does employed public relations and utilized the alleged professional accomplishments of Defendant Johnson in mathematics and by means of publications as a means and method and in order to enhance the reputation of the Nicolet School District and its Board and staff. The Defendants sought to create a "buzz" about the school and increase its selectivity and academic reputation in the community and in the views of elite colleges, including but not limited to Ivy League universities.

30)    Unfortunately for the victims, including but not limited to Bonchek, Nicolet, the Nicolet Defendants and the John Does continued to employ this "public relations strategy," after becoming fully apprised of the dark and twisted sexual fantasies and exploitation of Johnson upon the boys in the Nicolet community.  As a result, Nicolet, the Nicolet Defendants and the John Does perpetrated a fraud and cover-up of Johnson's exploitation of Nicolet students, and concluded, expressly and/or implicitly, that the protection of the boys of Nicolet, including but not limited to Bonchek, from Johnson's victimization was not as important as the protection of Nicolet's reputation and that of Johnson, the Board and staff and especially the Nicolet Defendants.

31)    Upon information and belief, Johnson also had a well-known affinity for the performance of "magic," and was named "Outstanding Wisconsin Magician" from the Society of

12

American Magicians, State Chapter and was a member of the Wisconsin Houdini Club, Inc. Unfortunately, while a teacher and advisor at Nicolet, the Defendant parlayed his "talent" in "magic" and the cover of philanthropy as a means to satisfy his sexual urges with young students.

32)     For example, in or about 1973, Defendant Johnson became the founder and teacher advisor for the Nicolet "Magic Company" or the "Magic Revue," an extra-curricular activity or club for students who had an interest in performing in the annual Nicolet "Magic Show" with proceeds going to various non-profit and worthy causes in the Milwaukee, Wisconsin metropolitan area.

33)     For example, in or about the early 1980's, the Nicolet Magic Company held its annual performance, entitled "Mirth, Melody and Magic," with all proceeds for the benefit of those suffering from muscular dystrophy. In or about 1981, the Magic Company included the following, *inter alia*, as "special features:" a) "The Little," in which a young female performer was "cut up" into three (3) pieces, which were then moved and reassembled before the audience; b) "The Guillotine;" c) "The Lady in Sixths;" d) "The Sands of India;" e) "The Mystery of the Blue Gin;" f) "Blackstone's Dancing Handkerchief;" and g) that classic old illusion, "Sawing the Lady in Half." *See* Glendale Herald Article, dated February 26, 1981, attached, restated and incorporated by reference herein as **Exhibit D**.

34)     Furthermore, between in or about 1979 and/or 1983 and/or thereafter, and with the implicit and/or explicit acknowledgement and approval of Nicolet, the Nicolet Defendants, and the John Does, the "*Shield,"* would annually publish reviews of the Magic Company and the participation of Johnson.  For example, in the 1979 Shield, Nicolet, the Nicolet Defendants and/or the Does stated, *inter alia* and in pertinent part, as follows:

> "Nicolet High School Magic Revue consisted of student magicians. The Magic
> Company donated the proceeds of over $1,000 to the Wisconsin Chapter of the

13

Muscular Dystrophy Association…. [A student magician] also said that 'the Magic Company received an opportunity to be on television and a chance to meet some famous magicians ….  David Johnson, chairman of the Nicolet math department and advisor and founder of the Magic Revue, expressed 'the amount was the largest raised in the six year history of the benefit show.' Mr. Johnson said there were three shows and a crowd of four-hundred to each show…. Mr. Johnson said, 'I was very proud of the students in our magic revue. They did a professional job….'"

*See* Article from *Shield*, dated 1979, attached, restated and incorporated by reference herein as

**Exhibit E**.

35)     By and through its public relations expertise and media manipulation, Nicolet, the

Nicolet Defendants and the John Does, praised Johnson and his "Magic Revue" in the Glendale

Herald, which stated, in pertinent part, as follows:

> "The results of tryouts held on Dec. 15 for the Nicolet Magic Revue were announced by David Johnson, chairman of the mathematics department and advisor of the Magic Revue….
>
> Members were selected using the following criteria: Quality of presentation, grooming and appearance, originality of presentation, use of voice and grammar, effort needed to prepare performance and poise.
>
> The purpose of the Nicolet Magic Revue is to provide students with the opportunity to *develop character traits of dependability and responsibility*, a stage presence and *poise*, a greater interest and understanding of show business and particularly the art of prestidigitation, and as a group, *qualities of teamwork, loyalty, cooperativeness and unselfishness* and provide family *entertainment* for all families of the school district…."

*See* Glendale Herald Article, dated December 24, 1981, attached, restated and incorporated by

reference herein as **Exhibit F** (emphasis added).

36)     Unfortunately for Plaintiff Bonchek and the other victims of sexual abuse, Johnson

also used manipulation and extortion, seeking to "develop" many of these same "character traits"

of "dependability and responsibility, … poise, … qualities of teamwork, loyalty, cooperativeness

and unselfishness" in his young victims in order to create his own illusion:  that the Magic

Company was not a noble effort to develop young leaders, raise money for charity, and entertain

14

the community, but in fact a deviant laboratory for selecting, grooming and manipulating young boys for his own twisted "entertainment."

37)     By and through its "public relations" strategy, Nicolet, the Nicolet Defendants and the John Does disseminated, distributed and publicized, and/or caused to be disseminated, distributed and publicized, "Magic Company" events and performances, thereby continuing to enhance the reputation of Johnson, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, and further the exploitation and victimization of children under the protection and care of the Defendants. *See* Glendale Herald Article, dated October 15, 1981, attached, restated and incorporated by reference herein as **Exhibit G**; Glendale Herald Article, dated February 25, 1982, attached, restated and incorporated by reference herein as **Exhibit H**; Glendale Herald Article, dated March 16, 1983, attached, restated and incorporated by reference herein as **Exhibit I**; Glendale Herald Article, dated March 26, 1983, attached, restated and incorporated by reference herein as **Exhibit J**.

38)     By his loathsome design, the Magic Company served as a vehicle for Johnson to self-select boys most suited for his predations.  The Defendant sought out teens who were particularly strong in "cooperation" and "loyalty." Johnson then evaluated the most promising candidates in close proximity, and with their participation, thereafter grooming them through training and promotion, together with the prestige earned by leadership positions.

39)     By his manipulative scheme, Johnson initially groomed and promoted boys, thereby creating an (illusory) bond and trust between the Defendant and his victim. He generally employed extortionate and coercive measures after the student had been installed in a leadership position in the Magic Company.  With the existence of a trusted relationship and a leadership position, Johnson then utilized his victim's need for a college recommendation, his fear of

humiliation, or other threat or favor to extort and coerce sexual abuses from the boy. Furthermore, the professed innocence and noble purpose of the Magic Company – from the tuxedos to the charitable cause – ensured that any complaint would be met with skepticism and disbelief.

40) Between in or about 1979 and 1982, Plaintiff Bonchek was a member of the Nicolet "Magic Revue" or the "Magic Company," during which time he was unknowingly being groomed for sexual exploitation by Johnson, for his perverted sexual fantasies. *See* Article from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit K**.

41) Similarly, Defendant Johnson was also the founder and teacher advisor for the "Hosts," an extra-curricular activity or club seeking assistance at Nicolet public events while making a contribution to various non-profit and worthy causes in the Milwaukee, Wisconsin metropolitan area. Unfortunately, the Defendant, once again, primarily used the "Hosts," as a vehicle to groom and manipulate young boys at Nicolet in order to satisfy his demented sexual urges. Moreover, Nicolet, the Board and staff, the Nicolet Defendants and the John Does facilitated Johnson's scheme and employed its public relations machinery as means and method to cover-up the victimization being perpetrated by its supposed star mathematics instructor.

42) By and through its public relations expertise and media manipulation, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, praised Johnson and his "Hosts" in the December 24, 1981 Glendale Herald, which stated, in pertinent part, as follows:

> "Fifty freshmen boys and girls have been named members of the Nicolet High School Hosts for the class of 1985.
>
> The Nicolet Hosts provide the opportunity for members of the freshmen, sophomore and junior classes to: study and participate in the field of public relations; serve unselfishly members of the community and fellow students at auditorium and gymnasium events throughout the school year; to develop *qualities of leadership, a sense of responsibility, poise, self-confidence and sincere friendliness* through the meeting and *serving* of people in the community, said advisor David Johnson, chairman of Nicolet's math department.

16

Each year, freshmen are selected to be Hosts on the basis of *criteria* which include personal acceptance by peers and adults, *dependability, self-direction, desire to learn, attitude, poise, speech, enthusiasm and grooming*, and the result of a *personal interview*.

Approximately 115 students applied for membership in the organization this year.

As freshmen, the Host *study public relations and procedures* under the direction of Johnson.

During the second semester of their freshmen year and while they are sophomores, the members serve as hosts to Nicolet visitors at most auditorium and gymnasium events, commencement and other special district meetings…."

*See* Glendale Herald Article, dated December 24, 1981, attached, restated and incorporated by reference herein as **Exhibit L** (emphasis added).

43)     Unfortunately for the Plaintiff and the other victims of his sexual abuse, after conducting a "personal interview" of the young victims, Johnson also misused his position of authority to build trust, seeking to "develop" many of these same "qualities" of "dependability, self-direction, desire to learn, attitude, poise, … enthusiasm and grooming" in desire for gratification of his base sexual urges.  Victims were chosen by the Defendant after displaying "leadership, a sense of responsibility, poise, self-confidence, … qualities of teamwork, loyalty, cooperativeness and unselfishness" in order to "host" the perverse needs of the Defendant.

44)     The Hosts were another means by which Johnson culled the school community to identify boys most suited for his predations.  As with the Magic Company, Johnson groomed and promoted the young teens in order to create a false sense of trust between the Defendant and his victims. By promoting students into leadership positions, Johnson drew the boys closer into his confidence and trust. Thereafter, with the existence of a trusted relationship and a leadership position in the Hosts, Johnson then manipulated and exploited his victim's fear of exposure or

17

humiliation, or other favor to extort and coerce sexual abuses from the boy. The Hosts was organized and promoted as a "service organization" in which students would "unselfishly" meet the needs of the school. Unfortunately, the real purpose was to be a service organization for Johnson to selfishly satisfy his own masturbatory fantasies.

45)     By and through its "public relations" strategy, Nicolet, the Board and staff, the Nicolet Defendants and the John Does disseminated, distributed and publicized, and/or caused to be disseminated, distributed and publicized, the "Hosts" at various Nicolet events and performances, thereby continuing to enhance the reputation of Johnson, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, and further the exploitation and victimization of children under the protection and care of the Defendants. *See* Article from Shield, dated 1981, attached, restated and incorporated by reference herein as **Exhibit M**; Article from Shield, dated 1982, attached, restated and incorporated by reference herein as **Exhibit N**.

46)     Between in or about 1979 and 1982, Plaintiff Bonchek was member of, and became the "Head" of, the Nicolet "Hosts," during which time he was unknowingly being groomed for sexual exploitation by Johnson, for his sexual fantasies. *See* Article from *Shield*, dated 1980, attached, restated and incorporated by reference herein as **Exhibit O**.

47)     Over the years and decades at Nicolet, as Johnson moved up the ranks in the School's hierarchy and collected various awards and recognition, he became the "go-to" teacher for an entrée by high-performing students seeking a recommendation to an elite or Ivy League college. By his leveraging and manipulating his ability to provide a recommendation, Johnson used threats and coercion as a means to seduce, intimidate and manipulate Nicolet boys, including but not limited to Bonchek, into becoming unwilling victims of his vile sexual fantasies. His position and power also prevented anyone from speaking up, as it would seem impossible to

18

imagine that someone of his unimpeachable reputation and public service could be guilty of such lascivious behavior.

48)     The son of a nationally recognized cardiac surgeon, between the late 1970's and early 1980's, Bonchek was a brilliant, high-achieving student at Nicolet. *See* Page from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit P**. The Plaintiff was well-regarded by his peers and would graduate as the 1982 Nicolet Valedictorian, while receiving numerous awards and honors, including as "The Johnson's Wax Fund" Scholar; the American Association of Teachers of German National Exam; the American Language and School Society State German Competition; the University of Wisconsin – River Falls Tall Contest – German; Mathematics Award – Braveland Conference Mathematics Meet, with Varsity Team Championship and Individual Honors; the National High School Mathematics Contest; and the University of Wisconsin – Madison Mathematics Science and Engineering Talent Search. *See* Pages from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit Q**.

49)     Through his elite performance in mathematics and his participation in the Hosts and in the Magic Company, Johnson quietly began grooming the Plaintiff for his sexual exploitation.  Upon information and belief, through Bonchek's freshman and sophomore years, Johnson "encouraged" Bonchek while quietly keeping an eye on him and intending to "develop" the young adolescent into one of his sexual trophies.

50)     In or about the fall of 1980 and during the Plaintiff's junior year at Nicolet, Johnson approached Bonchek and asked him to participate in a "research project" on a certain "statistical analysis" of "physiology," allegedly being conducted by the Defendant.  Johnson informed

Bonchek that he was conducting a statistical study on the "physiological response" of certain "athletic" activities and asked the Plaintiff to participate.

51)     At the time, Bonchek was actively considering his options for college and desperately wanted to attend an Ivy League university. During such conversations, Johnson threatened, implicitly and/or explicitly, to adjust his recommendation based on Bonchek's participation in the "research project," thereby destroying the Plaintiff's college dreams and hopes. Responding to the coercion and threats, the Plaintiff knew that, if he wanted to get into an Ivy League college, a glowing recommendation from Johnson was "critical." Pressured by the Defendant's threats and extortion, Bonchek was told that the "word was [from the Ivy League admissions officers that] if [Johnson] says you're in," then the Nicolet student gets admitted.

52)     In short, according to the Plaintiff's understanding, "Dave [Johnson] can pick them was basically the word." As a junior in high school, "that meant a lot" to the Plaintiff. Bonchek "figured [that his] … college recommendation was riding on … [Johnson's] recommendation."

53)     Feeling the threats, intimidation and pressure of coercion upon his college hopes and dreams, Bonchek succumbed to the pressure and agreed to "assist" Johnson in his "statistical research" on "physiology." In truth and in fact, the Defendant was manipulating and coercing the Plaintiff for sexual abuse and exploitation.

54)     Johnson informed the Plaintiff that the "research" would be conducted on the weekend, at the facilities of Nicolet High School, and that the Defendant would pick Bonchek up, at his home, and drive him to the school. The Defendant instructed the Plaintiff to bring gym clothes in order to properly participate in the athletics endeavors required by the "statistical research" into a "response" in "physiology."

20

55)     So, at approximately 10:30 a.m. on the following Saturday, the Defendant picked Bonchek up in his car and drove to Nicolet.  He instructed and caused the Plaintiff to change into gym clothes, and used safety pins in order to pin up the athletic shorts above the Plaintiff's hips.  Throughout the process, the Defendant sought to maintain the pretense of "research," by keeping a stopwatch and a journal to record the "data" arising from the "response" of the "physiological statistical analysis."

56)     Once the Plaintiff was attired as Johnson wished, the Defendant began to instruct the Plaintiff to perform certain "exercises" upon Johnson, which quickly became sexual in nature and were designed to create sexual arousal in Johnson.

57)     During the sexual abuse and exploitation, Johnson would be sweating throughout these "exercises," and repeatedly telling Bonchek to "keep going, another minute," until the Defendant reached the peak of arousal and ejaculated.

58)     Then, the "experiment was over" and, feeling shame and self-loathing over the sexual exploitation by the Defendant, the Plaintiff changed and Johnson drove him home.

59)     The sexual abuse of the Plaintiff continued, month after month, throughout the first and second semesters of Bonchek's junior year.  By his express and implicit threats, the Defendant repeatedly sexually abused and victimized the Plaintiff for his vile and disgusting sexual pleasure, while continuing to maintain the facade of conducting "research" into "physiology.  Rumors of Johnson's behavior were commonplace among Nicolet students, and Bonchek frequently had to "play along" while others wondered aloud "who Johnson was bringing up to his cabin this year." Bonchek was terrified that others would find out what was happening, simultaneously destroying both his life as he knew it, and the life he hoped to create for himself in the future.  In many ways, the psychological abuse from maintaining the secret to his parents and friends was as traumatic as

21

the physical abuse perpetrated by Johnson. This was in addition to the profound betrayal of trust from someone so admired in the community who professed to be so well-intentioned.

60)      Finally, in or about 1981 and after the second semester, the Defendant provided the Plaintiff with an appropriately sterling college recommendation, commensurate with Bonchek's accomplishments. With the recommendation in hand, Johnson's threats lost their power over Bonchek, and although the effects of the abuse would linger for decades, he became freed of the immediate coercion. Having completed yet another sexual conquest, Johnson stopped victimizing this innocent boy and apparently moved on to another sexual target.

61)      In an attempt to overcome his feelings of self-loathing and worthlessness, Bonchek threw himself back into his studies and graduated from Nicolet as Valedictorian in 1982, and thereafter attended Princeton. Unfortunately, the physical abuse may have been in his past, but the psychological damage only magnified with time.

62)      Meanwhile, Nicolet, the Board and staff, the Nicolet Defendants and the John Does continued to turn a blind eye to the conduct of Johnson and the rumors of impropriety, while promoting his awards and achievements as a positive reflection on the School District.

63)      That "blind eye," however, would soon change, if only briefly.

64)      Mere weeks before a report of sexual abuse upon a student was made to Nicolet, on or about May 6, 1983, Defendant Johnson received an award for "excellence as a secondary instructor and supervisor" by the Wisconsin Mathematics Council. Defendant Nicolet, the Nicolet Defendants and the John Does cranked up its public relations machinery and praised and promoted this accomplishment in the Glendale Herald. *See* Glendale Herald Article, dated May 26, 1983, attached, restated and incorporated by reference herein as **Exhibit R**.

65)      As reported in the Glendale Herald,

"'This distinguished recognition by his colleagues from throughout Wisconsin is a well deserved award.' That statement came from James Reiels, district administrator of Nicolet High School, in reference to an award given to teacher David Johnson.

Johnson was presented the 1983 award for excellence as a secondary instructor and supervisor. The presentation was made by the Wisconsin Mathematics Council at its annual meeting held May 6.

The recognition was based on Johnson's contributions to education as a classroom teacher, in his leadership role at state and national levels in math education, and as an author-lecturer of national repute. According to Reiels, Johnson is one of the most sought after keynote and banquet speakers in the National Council of Teachers of Mathematics. His presentations throughout the country focus on teaching and classroom management techniques for keeping students on task.

Johnson is former president of the Wisconsin Mathematics Council, editor of the Wisconsin Teacher of Mathematics, and program chairman of numerous WMC state meetings.

In his 25th year on the Nicolet High School faculty, he has taught mathematics, served as department chairman and advised the Nicolet Magic Company and the Nicolet Hosts. Other professional activities include serving on several boards of directors, including the National Council of Supervisors of Mathematics. He has served on task forces, state study committees and published a variety of math-oriented articles as well as three books on mathematics education."

*Id.*

66)     It is undisputed that in or about the early summer of 1983, a different Nicolet High School student and his parents reported sexual abuse by Johnson to a Nicolet staff member. *See* Correspondence from Dr. Robert Kobylski, Superintendent of Nicolet High School, to David Johnson, dated March 6, 2018, attached restated and incorporated by reference herein as **Exhibit S**.

67)     Upon information and belief, Nicolet, the Board and staff, the Nicolet Defendants and the John Does were notified of Johnson's sexual abuse and exploitation upon the Nicolet student.

23

68)     Upon receiving the complaint in or about the summer of 1983, upon information and belief, Nicolet, the Board and staff, the Nicolet Defendants and/or the John Does allegedly notified law enforcement of the complaint of sexual abuse upon a minor.

69)     It is undisputed that the Glendale law enforcement has no official record of any such report from Nicolet in or about the summer of 1983.

70)     It is undisputed that on or about July 13, 1983, the Nicolet School Board and/or the Nicolet Defendants and/or the John Does met in closed session with Johnson and confronted the Defendant about his sexual abuse and exploitation of the student. *Id.*

71)     Despite the alleged report to law enforcement and the heinous nature of the sexual abuse by Johnson, Nicolet, the Board and staff and/or the Nicolet Defendants and/or the John Does "agreed to continue [Johnson's] employment under certain conditions." *Id.*

72)     It is undisputed that the letter setting forth such "certain conditions" of the continued employment of Johnson by Nicolet does not exist in the personnel files or elsewhere in the records of Nicolet, and that a fraudulent concealment and cover-up of the crimes of Johnson occurred by Nicolet, the Board and staff, the Nicolet Defendants and/or the John Does.

73)     Indeed, the "blind eye" of Nicolet returned in a matter of days, as the Defendants intentionally and fraudulently concealed and covered-up the sexual abuse and victimization of minors by Johnson, as any disclosure would have seriously harmed the reputation of Nicolet, the Board and staff, the Nicolet Defendants and the John Does.  Needless to say, the public relations machinery at Nicolet could not, and would not, easily survive the impact of a scandal and investigation into the famous David Johnson.

74)     Solely as an example of the fraudulent concealment, on or about September 1, 1983, approximately a mere seven (7) weeks after the closed session School Board meeting with

Johnson, the Glendale Herald reported, in an article entitled "*Nicolet district head named to national task force*," in pertinent part as follows:

> "James Reiels, administrator of the Nicolet High School District, has been appointed as one of 11 educators who will assess American education from the perspective of its student successes. The two-year study is being underwritten by the Commission on Schools of the North Central Association of College and Schools, which accredits schools, colleges and universities in 19 states.
>
> Reiels joined Nicolet in 1959 as a teacher. He has been district administrator since 1974.
>
> The Task Force on Student Success will include in its study the findings of several national reports on education recently published. It will also search out other information needed to answer the key questions:
>
> - What school experiences contribute to the development of student success?
> - What changes in education programs would help students become more successful in schools?
> - What changes in the organization of education would help students become more successful in school?
>
> The Task Force includes teachers, administrators and evaluators.
>
> The North Central Association is the largest of the six regional accrediting associations in the nation with more than 5,000 schools and 900 colleges and universities. The NCA Commission on Schools develops standards for quality education and structures evaluation activities."

*See* Glendale Herald Article, dated September 1, 1983, attached, restated and incorporated by reference herein as **Exhibit T**.

75) Upon information and belief, Reiels never informed the Task Force or others at the NCA Commission on Schools that protecting students from sexual abuse and exploitation would contribute to the development of student success, or that changes in education programs – such as the firing of sexual predators like Johnson – would help students become more successful in schools.

25

76)     The pinnacle of the fraudulent concealment, however, followed as in or about October 1983, Johnson was awarded the 1983 Presidential Award for Excellence in Science and Mathematics teaching.  The Defendant was flown to Washington, D.C., along with other teachers, and was honored in a ceremony hosted by President Ronald Reagan.

77)     An article in the Glendale Herald, entitled "*Honored math teacher thrilled*," reported the events, in pertinent part, as follows:

> "'It really was just an unbelievable feeling and experience to be so appreciated,' Johnson said in a recent interview.
>
> 'Without a doubt, it was the greatest professional experience I have had. It was thrilling to be in the same room when the president of the United States stepped in,' he explained. 'When the president walked in, it was exceedingly silent. We all walked up to the stage like a graduation ceremony. He (the president) jumped on to the stage. He was peppy and vigorous, and his speech was excellent.'
>
> "And during all this whole time, you sat there and said, 'My gosh, I'm sitting here in the White House listening to the president of the United States. It was somewhat like a dream….'"

*See* Glendale Herald Article, dated November 24, 1983, attached, restated and incorporated by reference herein as **Exhibit U**.

78)     Indeed, upon information and belief, the Nicolet Defendants were more concerned about the Nicolet reputation as compared to the sexual exploitation of children. Solely as an example, in or about June 1989 and after Defendant Reiels announced his impending retirement in the following year, the Nicolet School Board President stated, as follows, to the Glendale Herald:

> "I think Dr. Reiels has done a wonderful job in what will be his 31 years at Nicolet. The innovations in teaching and curriculum all came through his knowledge and expertise. The school is of national prominence and our graduates are successes due to Dr. Reiels' ability to pick the best teachers available and to have the interest of the kids at heart, and to have expertise in many areas. The reputation of our school speaks for itself."

*See* Glendale Herald Article, dated June 29, 1989, attached, restated and incorporated by reference herein as **<u>Exhibit V</u>**.

79)     Furthermore, two (2) former Nicolet Board Presidents asserted that Defendant Reiels had the "ability to handle delicate and difficult situations with finesse." *Id.* One such former Board President claimed that "when the board and administration faced difficult personnel decisions," Defendant Reiels "had the ability to diffuse tension and bring it to [a] positive resolution." *Id.*

80)     Needless to say, no one asked Bonchek or the other victims of Johnson's sexual abuse and exploitation whether the fraudulent cover-up and mishandling of the Johnson "personnel decision" resulted in a "positive resolution." One can only assume that the difficult situation handled with finesse was how to maintain the illusion of Johnson's character, protect the reputation of the school, and keep the truth from being known by anyone else. *See also* Glendale Herald Article, dated June 14, 1990, attached, restated and incorporated by reference herein as **<u>Exhibit W</u>**.

81)     Throughout this entire period, the Defendants never disclosed that Johnson was a sexual predator to the victims, to the Nicolet community or to the public. From in or about the early 1980's to and including 1991, when Johnson retired, Nicolet, the Board and staff, the Nicolet Defendants and the John Does fraudulently concealed the sexual depredations of the Chairman of the Mathematics Department, and the Teacher Advisor to the Magic Company and the Hosts.

82)     Moreover, the Defendants continued to perpetrate a fraud and deceit upon the Plaintiff and other victims by publicly touting the accomplishments of Johnson, Nicolet, the Nicolet Defendants and the John Does, for years and decades thereafter. If the truth had become known, Bonchek and the other victims could have gotten help decades sooner. Instead, the

psychological damage continued to compound as the vicious circle of lies, shame and betrayal formed a tighter and tighter noose around their heart, strangling the sense of self, the ability to trust others, and notion of one's own worth that those who have not suffered abuse take for granted.

83)     In or about 2003, Johnson was arrested for Fourth Degree Sexual Assault, for incidents occurring on or about September 7, 2002 and March 21, 2003, in violation of Wisconsin Statutes §§ 940.225(3m).  Upon information and belief, the Defendant plead guilty to the criminal sexual assault and was sentenced. *See State of Wisconsin v. David R. Johnson,* Case No. 03CM218 (Circuit Ct., Waupaca Cty.), (public records) attached, restated and incorporated by reference herein as **Exhibit X**.

84)     Upon information and belief, Johnson was never required to register as a sex offender, and the victims and other members of the public were not apprised that the former Chairman of the Mathematics Department at Nicolet was a sexual predator.

85)     On or about March 26, 2018, and after an investigation by the Defendants, Nicolet sent a letter to the Nicolet High School Alumni, which concluded that

-     Johnson committed heinous acts of sexual abuse to at least two (2) students during the 1980's;

-     That there was "evidence that the District was made aware of … Johnson's misconduct during the summer of 1983, but allowed him to continue teaching at Nicolet…"

-     At the time, Nicolet and the Nicolet Defendants "clearly should have done much more to protect Nicolet students after being made aware of … Johnson's conduct."

*See* Correspondence from Dr. Kobylski, Superintendent of Nicolet High School to the Nicolet High School Alumni, dated March 26, 2018, attached restated and incorporated by reference herein as **Exhibit Y**.

28

86)     Also on or about March 26, 2018, the Defendants released the "*Summary of Findings of Independent Investigation*," which confirmed the evidence of the sexual abuse by Johnson, the reported complaint to the Defendants in the summer of 1983 and the closed door session of July 1983. *See Summary of Findings of Independent Investigation*," by Joseph M. Russell, Esq., attached restated and incorporated by reference herein as **Exhibit Z**.

87)     To make matters worse, the Plaintiff cooperated with the Defendants in the investigation, on the condition that the Defendants maintain the confidentiality of his identity. Thus, on or about November 14, 2016, the Parties executed a Non-Disclosure Agreement, as amended (hereinafter the "NDA"), in order to protect the identity of Bonchek, so as to avoid additional mental and emotional suffering as a result of potential disclosure of his identity as a victim of Johnson. *See* Non-Disclosure Agreement, dated November 14, 2016, as attached restated and incorporated by reference herein as **Exhibit AA**; *see also* Extension Agreement, dated September 30, 2017, as attached restated and incorporated by reference herein as **Exhibit BB.**

88)     Upon information and belief, the Defendants breached the NDA, failed to timely comply with the public records notifications and distributed and disseminated sufficient information regarding the Plaintiff in order to enable member(s) of the media to identify Bonchek as one of the victims of Johnson, creating further trauma in the form of fear, betrayal, and shame.

89)     And thus the suffering continued for the victims, including Plaintiff Bonchek, and continues to the present time.

90)     The abuse and sexual violence by the Defendant caused serious and permanent emotional and mental trauma to the Plaintiff.  As a survivor of sexual abuse and violence, he has experienced chronic feelings of anxiety, stress, paranoia and fear, and has suffered from "post-traumatic stress disorder" (PTSD) and severe dissociative disorder. Post-traumatic stress disorder

29

is an anxiety disorder that can result from a traumatic event, including sexual violence. Dissociative disorder is a disconnection of thoughts, feelings and identity, an experience of detachment or feeling as if one is outside one's body, and a loss or suppression of memory.

91)     With PTSD, the Plaintiff has experienced, and re-experienced, the feelings of being constantly in danger of being betrayed, reliving the events surrounding the abuse through flashbacks, dreams, or intrusive thoughts. The disassociation created a "persona" to protect Bonchek from these feelings.  Since his Nicolet years, Bonchek has experienced "avoidance," by intentionally or subconsciously changing his behavior in order to avoid scenarios associated with the sexual abuse at Nicolet or losing interest in activities he used to enjoy. The Plaintiff has suffered from hyper-arousal, and feeling "on edge" all of the time, like an undercover agent always afraid of his cover being blown.  Until very recently, he did not recognize himself in the mirror and did not believe that his own feelings and desires were worthy of consideration by others.  While on the outside, the Plaintiff appears a confident and accomplished man, this is in fact a shell, hiding a scared and damaged teenager, whose feelings and identity were frozen in 1982 when Johnson betrayed and abused him and the Defendants protected the perpetrator and conspired to keep it a secret.

92)     At all times relevant herein, the Defendants failed to meet and comply with the duty of care that the Defendant owed to the Plaintiff and others, as a minor and student in their care and protection.

93)     At all times relevant herein, the Plaintiff's severe physical injuries, mental and emotional trauma and distress, loss of earnings, and medical expenses were foreseeable as arising and the result of the Defendants' breaches of their duty of care as owed to the Plaintiff.  Since the abuse has been made public and Bonchek has been in recovery for his abuse, he has made

remarkable progress in healing his PTSD and disassociation, particularly lessening the fear, anxiety, stress, inhibition, loss of joy, lack of self-worth, and feelings of alienation and inadequacy. This progress is evidence that if the Defendants had not covered up the abuse years ago, Bonchek would have been able to heal much sooner and avoid the decades of damage that ensued.

94) At all times relevant herein, the Defendants' breach of their duty of care to the Plaintiff was the proximate cause of Bonchek's severe physical injuries, mental and emotional trauma and distress, loss of earnings, and medical expenses.

95) In sum, as a result of the Defendants' fraud and deceit, negligence, gross negligence and reckless and wanton conduct, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, loss of consortium, medical and/or health-related expenses, and together with costs, attorneys' fees and interest. Furthermore, the Plaintiff respectfully requests that he be awarded their general, compensatory and/or special damages and losses, in excess of $75,000.00, and costs, interest, multiple and/or punitive damages, reasonable attorneys' fees, and any such other relief as this Honorable Court deems just and appropriate.

## V. <u>CAUSES OF ACTION</u>

### COUNT I - NEGLIGENCE
### <u>(As to Nicolet, Nicolet Defendants and John Does 1 – 100)</u>
### (NEGLIGENCE - HIRING)

96)     The Plaintiff reasserts Paragraphs 1 through 95 above, with **Exhibits**, and restate and incorporate them herein by reference.

97)     The Defendants had a duty to the Plaintiff to hire Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

98)     The Defendants were negligent in hiring Johnson and in their actions and omissions, as set forth above.

99)     The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

100)    The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

101)    As a direct and proximate cause of the Defendants' negligence in the hiring of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT II - NEGLIGENCE
### <u>(As to Nicolet, Nicolet Defendants and John Does 1 – 100)</u>
### (NEGLIGENCE - RETENTION)

102)    The Plaintiff reasserts Paragraphs 1 through 101 above, with **Exhibits**, and restate and incorporate them herein by reference.

32

103) The Defendants had a duty to the Plaintiff to retain Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

104) The Defendants were negligent in retaining Johnson and in their actions and omissions, as set forth above.

105) The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

106) The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

107) As a direct and proximate cause of the Defendants' negligence in the retention of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT III - NEGLIGENCE
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
### (NEGLIGENCE - SUPERVISION)

108) The Plaintiff reasserts Paragraphs 1 through 107 above, with **Exhibits**, and restate and incorporate them herein by reference.

109) The Defendants had a duty to the Plaintiff to supervise Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

110) The Defendants were negligent in their supervision of Johnson and in their actions and omissions, as set forth above.

111) The harm to the Plaintiff as a result of the Defendants' negligence, and their actions,

courses of conduct and omissions was reasonably foreseeable.

112)     The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

113)     As a direct and proximate cause of the Defendants' negligence in the supervision of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT IV - NEGLIGENCE**
**(As to Nicolet, Nicolet Defendants and John Does 1 – 100)**
**(NEGLIGENCE – FAILURE TO WARN)**

114)     The Plaintiff reasserts Paragraphs 1 through 113 above, with **Exhibits**, and restate and incorporate them herein by reference.

115)     The Defendants had a duty to warn the Plaintiff as to the misconduct of Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

116)     The Defendants were negligent in their failure to warn the Plaintiff as to the misconduct of Johnson and in their actions and omissions, as set forth above.

117)     The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

118)     The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

119)     As a direct and proximate cause of the Defendants' negligence and failure to warn

as to the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT V – GROSS NEGLIGENCE**
**(As to Nicolet, Nicolet Defendants and John Does 1 – 100)**
**(GROSS NEGLIGENCE - HIRING)**

120)    The Plaintiff reasserts Paragraphs 1 through 119 above, with **Exhibits**, and restate and incorporate them herein by reference.

121)    The Defendants had a duty to the Plaintiff to hire Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

122)    The Defendants were grossly negligent, reckless and wanton in hiring Johnson and in their actions and omissions, as set forth above.

123)    The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

124)    The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

125)    As a direct and proximate cause of the Defendants' gross negligence in the hiring of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT VI – GROSS NEGLIGENCE**
**(As to Nicolet, Nicolet Defendants and John Does 1 – 100)**
**(GROSS NEGLIGENCE - RETENTION)**

126)     The Plaintiff reasserts Paragraphs 1 through 125 above, with **Exhibits**, and restate and incorporate them herein by reference.

127)     The Defendants had a duty to the Plaintiff to retain Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

128)     The Defendants were grossly negligent, reckless and wanton in retaining Johnson and in their actions and omissions, as set forth above.

129)     The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

130)     The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

131)     As a direct and proximate cause of the Defendants' gross negligence in the retention of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT VII – GROSS NEGLIGENCE**
**(As to Nicolet, Nicolet Defendants and John Does 1 – 100)**
**(GROSS NEGLIGENCE - SUPERVISION)**

132)     The Plaintiff reasserts Paragraphs 1 through 131 above, with **Exhibits**, and restate and incorporate them herein by reference.

133)     The Defendants had a duty to the Plaintiff to supervise Johnson in accordance with

the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

134)    The Defendants were grossly negligent, reckless and wanton in their supervision of Johnson and in their actions and omissions, as set forth above.

135)    The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

136)    The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

137)    As a direct and proximate cause of the Defendants' gross negligence in the supervision of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT VIII – GROSS NEGLIGENCE**
**(As to Nicolet, Nicolet Defendants and John Does 1 – 100)**
**(GROSS NEGLIGENCE – FAILURE TO WARN)**

138)    The Plaintiff reasserts Paragraphs 1 through 137 above, with **Exhibits**, and restate and incorporate them herein by reference.

139)    The Defendants had a duty to warn the Plaintiff as to the misconduct of Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

140)    The Defendants were grossly negligent, reckless and wanton in their failure to warn the Plaintiff as to the misconduct of Johnson and in their actions and omissions, as set forth above.

141)    The harm to the Plaintiff as a result of the Defendants' gross negligence, and their

37

actions, courses of conduct and omissions was reasonably foreseeable.

142) The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

143) As a direct and proximate cause of the Defendants' gross negligence and failure to warn as to the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT IX – INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS (All Defendants)

144) The Plaintiff reasserts Paragraphs 1 through 143 above, with **Exhibits**, and restate and incorporate them herein by reference.

145) As set forth above, the Defendants intentionally sought to inflict mental and emotional trauma and distress, with physical manifestations thereon, upon the Plaintiff, or they knew or should have known that emotional distress was the likely or foreseeable result of their actions, practices, and courses of conduct as described herein.

146) The Defendants' actions, practices and courses of conduct, as described herein, were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of teachers and educators, in the protection and care of students and minors.

147) The emotional distress sustained by the Plaintiff and his anguish at having to decide whether to submit by the demands of Defendant Johnson and the sexual abuse and exploitation, and/or the continued distress arising from the fraud and deceit of the Defendants in falsely touting and promoting Johnson in the media and to the Nicolet community.

38

148) As a direct and proximate cause of Defendants' intentional infliction of mental and emotional trauma and distress and the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT X – NEGLIGENT INFLICTION
## OF EMOTIONAL DISTRESS (All Defendants)

149) The Plaintiff reasserts Paragraphs 1 through 148 above, with **Exhibits**, and restate and incorporate them herein by reference.

150) The Defendants were negligent, reckless, and/or grossly negligent in their actions, practices, and courses of conduct as described herein.

151) These Defendants knew or should have known that mental and emotional trauma and distress was the likely or foreseeable result of their actions, practices, and course of conduct as described herein.

152) The actions, practices, and courses of conduct of these Defendants were the cause of the Plaintiff's mental and emotional trauma and distress, with physical manifestations.

153) The mental and emotional trauma and distress sustained by the Plaintiff was of such nature that a reasonable person would have suffered emotional distress, with physical manifestations, under the circumstances.

154) As a direct and proximate cause of Defendants' negligent infliction of mental and emotional trauma and distress and the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other

39

damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XI – BREACH OF CONTRACT
### (Nicolet, Nicolet Defendants and John Does 1 – 100 only)

155)    The Plaintiff reasserts Paragraphs 1 through 154 above, with **Exhibits**, and restate and incorporate them herein by reference.

156)    The Plaintiff and Nicolet Defendants entered into an NDA, as amended, in or about November 2016.

157)    The Plaintiff performed his duties and obligations under the NDA, as amended and in good faith.

158)    As set forth above, the Nicolet Defendants  knew or should have known that the information provided to the public through public records request could, and would, identity the Plaintiff and breach the NDA.

159)    As a direct and proximate cause of the breach of contract of the Nicolet Defendants, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XII – BREACH OF IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING (Nicolet, Nicolet Defendants and John Does 1 -100)

160)    The Plaintiff reasserts Paragraphs 1 through 159 above, with **Exhibits**, and restate and incorporate them herein by reference.

161) A covenant of good faith and fair dealing was implied and existed in the NDA and in the contractual relationship between the Plaintiff and the Nicolet Defendants.

162) The Nicolet Defendants had a duty of good faith and fair dealing in its dealings with the Plaintiff and pursuant to the NDA executed with the Plaintiff for the purpose of inducing him to contract and cooperate with the Nicolet Defendants.

163) As described above, Nicolet Defendants breached the implied covenant of good faith and fair dealing with the Plaintiff.

164) As a direct and proximate cause of the breach of the implied covenant of good faith and fair dealing by the Nicolet Defendants, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XIII –
## <u>NEGLIGENT MISREPRESENTATION (All Defendants)</u>

165) The Plaintiff reasserts Paragraphs 1 through 164 above, with **<u>Exhibits</u>**, and restate and incorporate them herein by reference.

166) The Defendants negligently concealed and misrepresented the sexual abuse, exploitation and misconduct of Johnson to the Plaintiff and to others, including but not limited by and through their public relations activities.

167) The conduct of the Defendants as described herein constitutes negligent misrepresentation in that the Defendants negligently published, disseminated and provided the Plaintiff and others with erroneous and misleading information, and negligently omitted material

Case 2:19-cv-00425   Filed 03/25/19   Page 41 of 45   Document 1

information with a duty to disclose regarding the sexual abuse, exploitation and misconduct of Johnson, to the Plaintiff's detriment.

168)     As a direct and proximate cause of the Defendants' negligent misrepresentations, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XIV -
## FRAUD AND DECEIT (All Defendants)

169)     The Plaintiff reasserts Paragraphs 1 through 168 above, with **Exhibits**, and restate and incorporate them herein by reference.

170)     The Defendants fraudulently concealed and misrepresented the sexual abuse, exploitation and misconduct of Johnson to the Plaintiff and to others, including but not limited by and through their public relations activities.

171)     The actions of the Defendants described herein constitute fraud and deceit, including but not limited to the following:

a)     the Defendants made false representations of material facts, and/or omitted material facts with a duty of disclosure, regarding the sexual abuse, exploitation and misconduct of Johnson, knowing or having reason to know of their falsity;

b)     the Defendants made said fraudulent misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff and others; and

c)     the Plaintiff and others did rely upon said misrepresentations and omissions, to their detriment.

42

172)     As a direct and proximate cause of the Defendants' fraud and deceit, the Plaintiff

has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss

of earning capacity, medical and/or health-related expenses, and general, special and consequential

damages, and other damages, injuries and losses, and that such amount in controversy exceeds

$75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XV – CIVIL CONSPIRACY (All Defendants).

173)     The Plaintiff reasserts Paragraphs 1 through 172 above, with **Exhibits**, and restate

and incorporate them herein by reference.

174)     The Defendants, together with others, combined, conspired, acted in concert, and/or

engaged in a conspiracy by entering into an agreement with unlawful motives and/or means, and

undertook overt acts towards the ends of such conspiracy.

175)     In order to attain of the outcome of its conspiracy, the Defendants required

coordination and actions to be taken in unison and/or in concert, together with joint tortious activity

of the other co-conspirators.

176)     The Defendants had the particular power and/or authority in their business and

business relationships to force, coerce, and/or encourage others to participate in this conspiracy

and result in retaliation and the termination of the Plaintiff's employment.

177)     As set forth above, Johnson performed acts and omissions herein alleged pursuant

to, and in furtherance of, a conspiracy with Nicolet, the Nicolet Defendants and/or the John Does.

178)     The Defendants furthered the conspiracy by lending aid and encouragement to the

other Defendants and ratifying and adopting the acts of their co-conspirators.

179)     As a direct and proximate cause of the Defendants' civil conspiracy, the Plaintiff

has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss

43

of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and that such amount in controversy exceeds $75,000.00, and together with costs, attorneys' fees and interest, to his detriment.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant him the following relief:

A)     determine, find and adjudge that Defendants and/or John Does 1-100 are liable for their violations of law, and award the Plaintiffs their actual losses and damages, together with their general, special and compensatory damages and other damages, injuries and losses, which are in excess of $75,000.00, and together with costs, attorneys' fees and interest, against the Defendants, jointly and/or severally, as set out herein;

B)     determine and award the Plaintiff, his losses and damages for his physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, which are in excess of $75,000.00, and together with costs, attorneys' fees and interest, as a result of the Defendants' violations of law, jointly and/or severally, as set out herein;

C)     award the Plaintiff his costs in bringing this action, including the filing fees, investigator expenses, expert and witness fees, costs and expenses, and reasonable attorneys' fees;

D)     award the Plaintiff multiple or punitive damages in an amount to be determined;

E)     determine and award the Plaintiff declaratory relief and judgment, as may be just, appropriate, necessary and/or proper;

44

F)      grant, order, restrain and enjoin the Defendants, jointly and severally, temporarily,

preliminarily and permanently, and grant the Plaintiff such equitable relief, as may be just,

appropriate, necessary and/or proper; and/or

G)      any additional relief which this Honorable Court deems just and proper.


**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**



Respectfully Submitted,
PLAINTIFF, Mark S. Bonchek,

By his Attorneys,


_/s/ Jeffrey R. Tone_____
Jeffrey R. Tone, Esq.
KATTEN & TEMPLE, LLP
The Rookery Building
209 South LaSalle Street, Suite
950 Chicago, Illinois 60604
Telephone: (312) 663-4400
Email: jtone@kattentemple.com


OF COUNSEL:

Philip M. Giordano, Esq.
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email:  pgiordano@reedgiordano.com


Dated: March 25, 2019

45