# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

```
====================================
```
MARK S. BONCHEK,                            :
                               :

                  **Plaintiff,**    :

                                 :

    vs.                                  :

                                  :

NICOLET UNIFIED SCHOOL DISTRICT,            :
NICOLET HIGH SCHOOL,                        :
6701 North Jean Nicolet Road                :
Glendale, Wisconsin 53217,                  :   **PLAINTIFF MARK S. BONCHEK'S**
                                  :   **SECOND AMENDED COMPLAINT**
ESTATE OF DAVID R. JOHNSON,                 :   **AND DEMAND FOR JURY TRIAL**
ORREN J. BRADLEY, former President of       :
  the NICOLET SCHOOL BOARD,                 :
GERALD T. HAIG, former Vice-President of    :
  the NICOLET SCHOOL BOARD,                 :   **Civil Action No. 2:19-cv-00425-JPS**
ESTATE OF WILLIAM M. HUEGEL, former         :
  Treasurer of the NICOLET SCHOOL BOARD,:
MYRA TAXMAN, former Clerk of                :
  the NICOLET SCHOOL BOARD,                 :
WILLIAM R. HEISER, former Member of         :
  the NICOLET SCHOOL BOARD,                 :
ROBERT STRAUSS, former Member of            :
  the NICOLET SCHOOL BOARD,                 :
ESTATE OF JAMES O. REIELS, a former         :
  Administrator of Nicolet School District, and :
JOHN DOES 1 – 100,                          :
                                  :
                  **Defendants.**  :
```
====================================
```

## I. INTRODUCTION

1)      Sadly, the sordid tale of sexual abuse of children goes on, with another perpetrator having satisfied his sick, sexual fantasies, while destroying the lives of children in his care. Once again, the sexual perpetrator was enabled by those adults in power, who covered up and fraudulently concealed the deviant sexual misconduct of their employee, and breached the duty of trust that society demands for the protection of children.

1

2) On December 23, 2019, this Honorable Court issued an Order (hereinafter the "December 23rd Order" or "Order") regarding various claims and Counts, as filed by the Plaintiff, Mark S. Bonchek (hereinafter "Bonchek") in his First Amended Complaint. Recognizing the impact of such Order as to the pleadings, the Plaintiff respectfully repleads and restates certain and/or several of his allegations and causes of action herein, not to fail to comply with such Order, but in order to preserve the same for potential appellate review as part of the operative pleadings pending before this Court.

3) The facts are not in dispute:

- David R. Johnson, a past Chairman of the Math and Science Departments at Nicolet High School, molested and sexually abused boys and young teens.

- The men and women of the Nicolet School Board - who were responsible for the protection of these innocent victims - not only did nothing, but covered it up and fraudulently hid Johnson's sexual abuse.

- The victims were brushed aside, by Nicolet High School, and by leaders who preferred to protect the abuser and their institutions.

- The primary objective was not to help children, but to avoid scandal to Nicolet and to avoid harm to the careers of the Nicolet Board, staff, Nicolet Defendants and the John Does.

- The Nicolet School Board, including the Board Officers and Members, had actual knowledge of this conduct and yet, the sexual deviant was routinely placed in classrooms and served as a teacher advisor for extra-curricular activities, while Nicolet was on notice that a complaint of child sexual abuse had been made.

- While conducting their own deficient, biased investigation into the crimes against children, the Nicolet administrators allegedly reported the sexual abuse to the authorities but, expressly and/or implicitly, agreed with law enforcement to terminate or avoid a true or thorough investigation.

- After receiving the report of sexual abuse against children, law enforcement failed to undertake any appropriate investigation, and/or by terminating it without enforcing the law for the protection of minors in the Nicolet community. Moreover, Nicolet administrators failed to terminate Defendant Johnson's employment or take other necessary and appropriate remedial steps to protect Nicolet students and children.

2

- After receiving notice of Johnson's deviant misconduct, Nicolet continued to fraudulently praise and promote Johnson as a leader at Nicolet and cited his receipt of the 1983 Presidential Award for Excellence in Mathematics Teaching, by President Ronald Reagan, and other Awards and honors bestowed upon Johnson.

- This conduct fraudulently concealed the sexual abuse of young boys and enabled Johnson to continue to endanger the welfare of children. The current Nicolet administration determined that Nicolet and the Nicolet Defendants "clearly should have done much more to protect Nicolet students after being made aware of … Johnson's conduct."

- Above all else, Nicolet protected its institution and the Board and staff at all costs, while destroying the lives of the innocent victims.

- Between in or about 2016 and 2018 and while the Johnson sexual abuse of students was being investigated by the Defendant, Nicolet executed a Non-Disclosure Agreement, as amended, with Bonchek, and, by the Non-Disclosure Agreement was obligated to maintain, as confidential, information,, *inter alia*, as to the Plaintiff's identity as a victim of the sexual abuse perpetrated by Johnson, and to provide notice and various procedural protections as to public record requests to the Defendant.

- As alleged herein, Defendant Nicolet breached the Non-Disclosure Agreement, as amended, inflicted emotional distress and invaded the privacy of the Plaintiff, and failed to maintain Bonchek's identity on a confidential basis, failed to maintain his Confidential Information solely on a "need-to-know" basis, and breached the notice and procedural protections as to public records requests to Nicolet.

- In or about March 2018, Defendant Nicolet published and disseminated a certain correspondence and Summary of Findings of its investigator, who was alleged to have been "independent."

- As a result of the Defendant's various breaches, disclosures and public information, in or about the spring of 2018, certain individual(s) in the media determined the identity of the Plaintiff and contacted with him, and thereby causing him significant loss of privacy, damages, injuries and emotional distress, with physical manifestations thereof, including headaches, stomach and gastrointestinal pains and distress, and sleeplessness, among others.

- Promptly thereafter, on or about April 6, 2018, Bonchek provided written notice to Nicolet pursuant to Wisc. Stat. § 893.80 regarding the breaches by the Defendant under the NDA, as amended, and of the claims of the Plaintiff.

- As a direct result of the actions and breaches by Nicolet, the Plaintiff has again been harmed by Nicolet, suffering damages, injuries and emotional distress, with

3

physical manifestations thereof, including headaches, stomach and gastrointestinal pains and distress, and sleeplessness, among others.

4)      As set forth below, the Plaintiff, Mark S. Bonchek, respectfully submits this Second Amended Complaint and Demand for Jury Trial (hereinafter the "Complaint" or the "Second Amended Complaint"). The Plaintiff is a victim of Johnson's sexual attacks and the fraud, deceit, misrepresentations and cover-up of Nicolet, and breaches of the NDA, the invasion of privacy and infliction of emotional distress by Nicolet.  Bonchek was victimized by the sexual abuse of David R. Johnson (hereinafter "Johnson") and the reckless and wanton conduct of the Nicolet Defendants, as defined herein, who violated the civil rights of the Plaintiff and Nicolet students, denied their Constitutional rights of Due Process and Equal Protection under the color of State law, and conspired as to such violations of federal law, and breached their duty of trust to protect the children in their care, while fraudulently covering up the molestation by Johnson.

5)      The Plaintiff further alleges that, as a result and as caused by Defendant Johnson's sexual abuse, and the negligence, gross negligence and reckless and wanton conduct of Nicolet, the Nicolet Defendants and/or the John Does, the Plaintiff has suffered decades of mental and emotional trauma and distress, a loss of self-esteem, pain and suffering, physical manifestations, and loss of earning capacity, with therapy and medical and/or health-related expenses, in excess of $75,000.00, and together with costs, attorneys' fees and interest.

6)      The Plaintiff respectfully requests that his action proceed to a trial by jury, that a judgment be entered on all Counts against the Defendants, jointly and severally, and that the Defendants be ordered to pay the Plaintiff his compensatory, consequential and general damages, together with costs, interest, multiple and/or punitive damages, reasonable attorneys' fees, and any such other relief as this Honorable Court deems just and appropriate.

4

## II. PARTIES

7)      At all times relevant herein, the Plaintiff, Mark S. Bonchek, is an adult and a resident of the Commonwealth of Massachusetts.  In the late 1970's and early 1980's, the Plaintiff was a student of Nicolet High School, graduating as the valedictorian in the spring of 1982. Bonchek was a young teenager at the time of his victimization by the sexual exploitation and sexual abuse by Johnson and the Defendants, as alleged herein.

8)      Between in or about 1958 and in or about 1991, and at all times relevant herein, Defendant Johnson was a math teacher, employed by Nicolet High School.  While at Nicolet, Defendant Johnson was a Chairman of the Math and Science Departments and the recipient of the 1983 Presidential Award for Excellence in Mathematics Teaching. The Defendant was a member of the Wisconsin Mathematics Council, the National Council of Teachers of Mathematics and the National Council of Supervisors of Mathematics.  During the relevant time, Johnson was the teacher advisor for Nicolet clubs known as the "Hosts," and the "Magic Company," using these extra-curricular activities as a vehicle for his enticement, coercion and entrapment of young boys into a cycle of sexual abuse and exploitation, while using the Nicolet High facilities for his deviant conduct towards minors.  On or about March 28, 2018 and after the revelation of his decades of sexual abuse at Nicolet, David R. Johnson committed suicide and his Estate is a Defendant in this litigation.

9)      Upon information and belief and during the relevant time period, the Defendant, the Nicolet Unified School District and Nicolet High School (collectively hereinafter "Nicolet"), is the municipal governmental organization which owns and operates the sole high school in the area. Nicolet claims to have the following mantra, as its guiding principle, *"Accelerating Achievement - Every Student, Every Classroom, Every Day.*" Unfortunately, the Defendant's fraud

and fraudulent concealment has demonstrated that its guiding principle was a Potemkin village, as the facade collapsed upon itself. Between in or about 1958 and 1991, Defendant Nicolet was the employer of Johnson, and for decades beginning no later than the early 1980's, enabled and fraudulently covered up his sexual abuse and exploitation of young boys, including Bonchek. By no later than the early 1980's, Nicolet had actual notice, arising from a complaint of sexual exploitation, of Johnson's molestation of young boys in their care. In direct contravention of its duty of care, the Defendant fraudulently covered up the Johnson crimes and fraudulently praised and promoted his alleged credentials and awards to the Nicolet community and others.

10)     Upon information and belief, between in or about 1978 and/or 1983 and/or thereafter, Defendant Orren J. Bradley (hereinafter "Bradley") was the President of the Nicolet School Board. With the other Members of the School Board, Defendant Bradley was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Bradley's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson.

11)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Gerald T. Haig (hereinafter "Haig") was the Vice-President of the Nicolet School Board. With the other Members of the School Board, Defendant Haig was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Haig's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's

6

supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of David Johnson.

12)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant William M. Huegel (hereinafter "Huegel") was the Treasurer of the Nicolet School Board. With the other Members of the School Board, Defendant Huegel was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Huegel's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson. Upon information and belief, on or about January 16, 2011, William M. Huegel passed away.

13)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Myra Taxman (hereinafter "Taxman") was the Clerk of the Nicolet School Board. With the other Members of the School Board, Defendant Taxman was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care.  During Taxman's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson.

14)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant William R. Heiser (hereinafter "Heiser") was a Member of the Nicolet School Board.

7

With the other Members of the School Board, Defendant Heiser was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Heiser's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson.

15)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant Robert Strauss (hereinafter "Strauss" and collectively, with Bradley, Haig, Huegel, Taxman and Heiser, thereinafter the ""Nicolet Board Members" or the "Board Members") was a Member of the Nicolet School Board. With the other Members of the School Board, Defendant Strauss was apprised of a complaint of sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Strauss's tenure on the School Board and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson.

16)     Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant James O. Reiels (hereinafter "Reiels") was the Administrator of the Nicolet School District (collectively, with the Defendant Board Members and with Defendant Nicolet, hereinafter as the "Nicolet Defendants"). Upon information and belief, in or about 1959, Reiels joined Nicolet as a teacher and in or about 1974, became District Administrator. With the Members of the School Board, Defendant Reiels was apprised of a complaint of sexual abuse and exploitation by

Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During Reiels' tenure as the School Administrator and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson. Upon information and belief, on or about October 23, 2016, James O. Reiels passed away.

17) Upon information and belief, between in or about 1978 and 1983 and/or thereafter, Defendant John Does 1 - 100 (hereinafter the "John Does" or the "Does") were persons and/or employees, whether teachers, staff and/or other authorized agents of the Nicolet School District, who knew, or should have known, of the sexual exploitation and abuse by Defendant Johnson of innocent young boys at Nicolet. With the Members of the School Board, Defendant Does knew, or should have known, of the sexual abuse and exploitation by Defendant Johnson and then fraudulently covered up such crimes, breaching the Nicolet duty of trust to young boys within its care. During the tenure of certain John Does at the School and thereafter, Nicolet continued to fraudulently praise and promote Johnson's supposed credentials, experience and expertise as a math teacher and mentor of young boys, thereby facilitating and assisting in satisfying the deviant sexual appetite of Defendant David Johnson.

### III. JURISDICTION AND VENUE

18) The Plaintiff asserts that this Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331, which confers jurisdiction to the district courts over all civil cases arising under the Constitution, laws, and treaties of the United States.

19) The Plaintiff further asserts that this Honorable Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1343, which confers original jurisdiction to the district

courts over any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

20) Additionally, the Plaintiff brings this action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution and pursuant to such federal statutes enacted thereunder, including but not limited to 42 U.S.C. §§ 1983 and 1985.

21) The Plaintiff further asserts that this Honorable Court has jurisdiction over this action under 28 U.S.C. § 1332 because the Parties are of complete diversity, in that the Plaintiff is a resident and citizen of the Commonwealth of Massachusetts and each Defendant is a citizen of the State of Wisconsin, and that the amount in controversy exceeds $75,000.00.

22) The Plaintiff further contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Wisconsin in that such District is where the Non-Disclosure Agreement was executed and was breached and where the invasion of privacy and infliction of emotional distress occurred, and is where Plaintiff was sexually abused by Defendant Johnson, is where Defendant Nicolet is located and headquartered, is where the fraudulent concealment, the fraudulent puffery of Johnson, the breach of trust and enforcement of the law by the Defendants and the other violative conduct described herein is alleged to have occurred.

10

23) This Honorable Court has personal jurisdiction, generally and specifically, over the Defendants as arising from their residence and principal headquarters within the District, generally over time and specifically in their dealings with the Plaintiff, within the State of Wisconsin.

## IV. <u>FACTUAL BACKGROUND</u>

24) The Plaintiff alleges that the following facts, without limitation, give rise to his claims for relief:

25) Between at least the 1950's and the present time, including but not limited to the relevant time period, Nicolet had established itself as a high school for elite and exceptional students in the State of Wisconsin. The Nicolet High School has sought to create an image of itself as a bastion for educating the children of professionals and the elite in the greater metropolitan Milwaukee, resulting in the School claiming many prominent citizens of Wisconsin as alumni/ae. Its curriculum has generally followed that of the "Enlightenment" model, which holds the "classics" to be the basis of an educated mind.

26) As a high-performing and well-regarded school, Nicolet High School has had an advanced placement program that includes calculus (AB and BC), statistics, computer science, physics (mechanics and electromagnetism), chemistry, biology, environmental science, English language and composition, French language, Spanish language, Spanish literature, German language, music theory, American history, European history, macro-economics, micro-economics, studio art (drawing, 2D, 3D), and American government. During the relevant time period and upon information and belief, Nicolet generally committed to spend more money per student than other comparable high schools in the State of Wisconsin.

27) Nicolet High School has been named to the "*Blue Ribbon School of Excellence*," the U.S. Department of Education's highest award and in or about 2008, was listed as one of the

fifty (50) best schools in Wisconsin by *U.S. News and World Report,* in an assessment of more than 20,500 public high schools from 50 states and the District of Columbia by the magazine.

28)  In or about 1958, Nicolet hired Defendant Johnson as an instructor and teacher in the Mathematics Department at the Nicolet High School and thereafter as the Chairman of the Mathematics / Science Department and Administrative Supervisor of the Mathematics and Science Personnel at Nicolet.  Johnson allegedly had sterling credentials, having a Master of Science degree from the University of Wisconsin, and was considered an exceptional addition to the teaching staff and especially the Mathematics Department at Nicolet.

29)  Over the decades, Johnson made a name for himself as an innovator and leader in teaching methodologies of mathematics.  The Defendant was an active member in various professional organizations, having become Editor of the *Wisconsin Mathematics Teacher* publication and as President of the Wisconsin Mathematics Council. The Defendant was active in the National Council of Teachers of Mathematics (hereinafter the "NCTM"), serving as Chairman, Vice-Chairman and member of various committees and on the NCTM Board of Directors. Johnson was also active in the National Council of Supervisors of Mathematics (hereinafter the "NCSM"), serving as President, North Central Regional Director and committee member over the years.

30)  Between in or about 1977 and 1994, Defendant Johnson was the author of a number of articles and publications, including, *inter alia*, the 1977 NCTM edition of "*Guidelines for the Tutor of Mathematics*," the 1982 publications entitled "*Mathematics Contests – A Handbook for Mathematics Educators*," by NCTM and entitled "*Every Minute Counts: Making Your Math Class Work*," by Seymour Publications in Palo Alto, California.

31)  Upon information and belief, between 1958 and early 1980's, Nicolet, the Nicolet Defendants and the John Does promoted the education, skills, expertise, awards and activities of

Defendant Johnson in the Nicolet community and particularly the media, including but not limited to the Glendale Herald and in the Nicolet yearbook, entitled "*Shield*." *See* Article from *Shield*, dated 1979, attached, restated and incorporated by reference herein as **Exhibit A**.

32)     For example, in the April 8, 1982 Glendale Herald, Nicolet, the Nicolet Defendants and the John Does touted the math publications of Johnson and his alleged expertise in the field, which stated, in pertinent part, as follows:

> "A textbook of mathematics teaching methods and a handbook on mathematics contests for educators have been written by Nicolet High School instructors.
>
> David R. Johnson, chairman of the Nicolet mathematics department, and supervisor of personnel of Nicolet High School, has written "*Every Minute Counts: Making Your Math Class Work*." The book has been published by Dale Seymour Publications, Palo Alto, Calif.
>
> The textbook of teaching methods for the secondary mathematics teacher is designed for the beginner as well as the experienced professional and can be used for college courses and teacher inservice [sic] programs.
>
> Johnson is a member of the mathematics coordinating committee for the middle schools in the district. Teacher [sic] frequently observe his classroom techniques. In 1968, he received the Society of Engineering Institutes award for outstanding mathematics teacher, and, in 1975, he received a "Professor for the Day Award" from the University of Wisconsin-Oshkosh. He is a member of national mathematics associations and is a nationally-known speaker in his field. He has written several articles in mathematics publications.
>
> Another new book that Johnson has written with Nicolet mathematics instructor … is '*A Handbook on Mathematics Contests for Mathematics Educators.*' The book has been published by the National Council of Teachers of Mathematics, Washington, D.C.
>
> The book provides models for designing mathematics contests for students from elementary to college levels.
>
> Johnson is also mathematics resource coordinator for Nicolet and adjunct instructor of mathematics for Lakeland College and has spoken at national mathematics associations meetings regarding a new approach to teach calculus."

*See* Glendale Herald Article, dated April 8, 1982, attached, restated and incorporated by reference herein as **Exhibit B**; *see also* Glendale Herald Article, dated March 1983, attached, restated and incorporated by reference herein as **Exhibit C**.

33)     Upon further information and belief, Nicolet, the Nicolet Defendants and the John Does employed public relations and utilized the alleged professional accomplishments of Defendant Johnson in mathematics and by means of publications as a means and method and in order to enhance the reputation of the Nicolet School District and its Board and staff. The Defendants sought to create a "buzz" about the school and increase its selectivity and academic reputation in the community and in the views of elite colleges, including but not limited to Ivy League universities.

34)     Upon information and belief, Johnson began his sexual abuse in or about the 1970's continuing at least until in or about the summer of 1983 and thereafter, at which time Nicolet and the Nicolet Defendants were expressly informed of and given actual notice Johnson's deviant conduct. During the aforementioned period, Defendant Johnson's molestation and sexual abuse of the boys at Nicolet was well known throughout the School community.

35)     Unfortunately for the victims, including but not limited to Bonchek, the Nicolet Defendants, Nicolet and the John Does continued to employ their "public relations strategy," after becoming fully apprised of the dark and twisted sexual fantasies and exploitation of Defendant Johnson upon the boys in the Nicolet community.  As a result, Nicolet, the Nicolet Defendants and the John Does perpetrated a fraud and cover-up of Johnson's exploitation of Nicolet students. Nicolet, the Nicolet Defendants and the John Does concluded, expressly and/or implicitly, that the protection of the boys of Nicolet, including but not limited to Bonchek, from Johnson's

14

victimization was not as important as the protection of Nicolet's reputation and that of Johnson, the Board and staff and especially the Nicolet Defendants.

36)    Upon information and belief, Johnson also had a well-known affinity for the performance of "magic," and was named "Outstanding Wisconsin Magician" from the Society of American Magicians, State Chapter and was a member of the Wisconsin Houdini Club, Inc. Unfortunately, while a teacher and advisor at Nicolet, the Defendant parlayed his "talent" in "magic" and the cover of philanthropy as a means to satisfy his sexual urges with young students.

37)    For example, in or about 1973, Defendant Johnson became the founder and teacher advisor for the Nicolet "Magic Company" or the "Magic Revue," an extra-curricular activity or club for students who had an interest in performing in the annual Nicolet "Magic Show" with proceeds going to various non-profit and worthy causes in the Milwaukee, Wisconsin metropolitan area.

38)    For example, in or about the early 1980's, the Nicolet Magic Company held its annual performance, entitled "Mirth, Melody and Magic," with all proceeds for the benefit of those suffering from muscular dystrophy. In or about 1981, the Magic Company included the following, *inter alia*, as "special features:" a) "The Little," in which a young female performer was "cut up" into three (3) pieces, which were then moved and reassembled before the audience; b) "The Guillotine;" c) "The Lady in Sixths;" d) "The Sands of India;" e) "The Mystery of the Blue Gin;" f) "Blackstone's Dancing Handkerchief;" and g) that classic old illusion, "Sawing the Lady in Half." *See* Glendale Herald Article, dated February 26, 1981, attached, restated and incorporated by reference herein as **Exhibit D**.

39)    Furthermore, between in or about 1979 and/or 1983 and/or thereafter, and with the implicit and/or explicit acknowledgement and approval of Nicolet, the Nicolet Defendants, and

the John Does, the "*Shield,*" would annually publish reviews of the Magic Company and the participation of Johnson. For example, in the 1979 Shield, Nicolet, the Nicolet Defendants and/or the Does stated, *inter alia* and in pertinent part, as follows:

> "Nicolet High School Magic Revue consisted of student magicians. The Magic Company donated the proceeds of over $1,000 to the Wisconsin Chapter of the Muscular Dystrophy Association…. [A student magician] also said that 'the Magic Company received an opportunity to be on television and a chance to meet some famous magicians …. David Johnson, chairman of the Nicolet math department and advisor and founder of the Magic Revue, expressed 'the amount was the largest raised in the six-year history of the benefit show.' Mr. Johnson said there were three shows and a crowd of four-hundred to each show…. Mr. Johnson said, 'I was very proud of the students in our magic revue. They did a professional job….'"

*See* Article from *Shield*, dated 1979, attached, restated and incorporated by reference herein as **Exhibit E**.

40) By and through its public relations expertise and media manipulation, Nicolet, the Nicolet Defendants and the John Does, praised Johnson and his "Magic Revue" in the Glendale Herald, which stated, in pertinent part, as follows:

> "The results of tryouts held on Dec. 15 for the Nicolet Magic Revue were announced by David Johnson, chairman of the mathematics department and advisor of the Magic Revue….
>
> Members were selected using the following criteria: Quality of presentation, grooming and appearance, originality of presentation, use of voice and grammar, effort needed to prepare performance and poise.
>
> The purpose of the Nicolet Magic Revue is to provide students with the opportunity to *develop character traits of dependability and responsibility*, a stage presence and *poise*, a greater interest and understanding of show business and particularly the art of prestidigitation, and as a group, *qualities of teamwork, loyalty, cooperativeness and unselfishness* and provide family *entertainment* for all families of the school district…."

*See* Glendale Herald Article, dated December 24, 1981, attached, restated and incorporated by reference herein as **Exhibit F** (emphasis added).

16

41)     Unfortunately for Plaintiff Bonchek and the other victims of sexual abuse, Johnson also used manipulation and extortion, seeking to "develop" many of these same "character traits" of "dependability and responsibility, … poise, … qualities of teamwork, loyalty, cooperativeness and unselfishness" in his young victims in order to create his own illusion:  that the Magic Company was not a noble effort to develop young leaders, raise money for charity, and entertain the community, but in fact a deviant laboratory for selecting, grooming and manipulating young boys for his own twisted "entertainment."

42)     By and through its "public relations" strategy, Nicolet, the Nicolet Defendants and the John Does disseminated, distributed and publicized, and/or caused to be disseminated, distributed and publicized, "Magic Company" events and performances, thereby continuing to enhance the reputation of Johnson, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, and further the exploitation and victimization of children under the protection and care of the Defendants.  *See* Glendale Herald Article, dated October 15, 1981, attached, restated and incorporated by reference herein as **Exhibit G**; Glendale Herald Article, dated February 25, 1982, attached, restated and incorporated by reference herein as **Exhibit H**; Glendale Herald Article, dated March 16, 1983, attached, restated and incorporated by reference herein as **Exhibit I**; Glendale Herald Article, dated March 26, 1983, attached, restated and incorporated by reference herein as **Exhibit J**.

43)     By his loathsome design, the Magic Company served as a vehicle for Johnson to self-select boys most suited for his predations.  The Defendant sought out teens who were particularly strong in "cooperation" and "loyalty." Johnson then evaluated the most promising candidates in close proximity, and with their participation, thereafter grooming them through training and promotion, together with the prestige earned by leadership positions.

44)     By his manipulative scheme, Johnson initially groomed and promoted boys, thereby creating an (illusory) bond and trust between the Defendant and his victim. He generally employed extortionate and coercive measures after the student had been installed in a leadership position in the Magic Company. With the existence of a trusted relationship and a leadership position, Johnson then utilized his victim's need for a college recommendation, his fear of humiliation, or other threat or favor to extort and coerce sexual abuses from the boy. Furthermore, the professed innocence and noble purpose of the Magic Company – from the tuxedos to the charitable cause – ensured that any complaint would be met with skepticism and disbelief.

45)     Between in or about 1979 and 1982, Plaintiff Bonchek was a member of the Nicolet "Magic Revue" or the "Magic Company," during which time he was unknowingly being groomed for sexual exploitation by Johnson, for his perverted sexual fantasies. *See* Article from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit K**.

46)     Similarly, Defendant Johnson was also the founder and teacher advisor for the "Hosts," an extra-curricular activity or club seeking assistance at Nicolet public events while making a contribution to various non-profit and worthy causes in the Milwaukee, Wisconsin metropolitan area. Unfortunately, the Defendant, once again, primarily used the "Hosts," as a vehicle to groom and manipulate young boys at Nicolet in order to satisfy his demented sexual urges. Moreover, Nicolet, the Board and staff, the Nicolet Defendants and the John Does facilitated Johnson's scheme and employed its public relations machinery as means and method to cover-up the victimization being perpetrated by its supposed star mathematics instructor.

47)     By and through its public relations expertise and media manipulation, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, praised Johnson and his "Hosts" in the December 24, 1981 Glendale Herald, which stated, in pertinent part, as follows:

18

"Fifty freshmen boys and girls have been named members of the Nicolet High School Hosts for the class of 1985.

The Nicolet Hosts provide the opportunity for members of the freshmen, sophomore and junior classes to: study and participate in the field of public relations; serve unselfishly members of the community and fellow students at auditorium and gymnasium events throughout the school year; to develop *qualities of leadership, a sense of responsibility, poise, self-confidence and sincere friendliness* through the meeting and *serving* of people in the community, said advisor David Johnson, chairman of Nicolet's math department.

Each year, freshmen are selected to be Hosts on the basis of *criteria* which include personal acceptance by peers and adults, *dependability, self-direction, desire to learn, attitude, poise, speech, enthusiasm and grooming*, and the result of a *personal interview*.

Approximately 115 students applied for membership in the organization this year.

As freshmen, the Host *study public relations and procedures* under the direction of Johnson.

During the second semester of their freshmen year and while they are sophomores, the members serve as hosts to Nicolet visitors at most auditorium and gymnasium events, commencement and other special district meetings…."

*See* Glendale Herald Article, dated December 24, 1981, attached, restated and incorporated by reference herein as **Exhibit L** (emphasis added).

48)      Unfortunately for the Plaintiff and the other victims of his sexual abuse, after conducting a "personal interview" of the young victims, Johnson also misused his position of authority to build trust, seeking to "develop" many of these same "qualities" of "dependability, self-direction, desire to learn, attitude, poise, … enthusiasm and grooming" in desire for gratification of his base sexual urges.  Victims were chosen by the Defendant after displaying "leadership, a sense of responsibility, poise, self-confidence, … qualities of teamwork, loyalty, cooperativeness and unselfishness" in order to "host" the perverse needs of the Defendant.

19

49)     The Hosts were another means by which Johnson culled the school community to identify boys most suited for his predations.  As with the Magic Company, Johnson groomed and promoted the young teens in order to create a false sense of trust between the Defendant and his victim. By promoting students into leadership positions, Johnson drew the boys closer into his confidence and trust. Thereafter, with the existence of a trusted relationship and a leadership position in the Hosts, Johnson then manipulated and exploited his victim's fear of exposure or humiliation, or other favor to extort and coerce sexual abuses from the boy.  The Hosts was organized and promoted as a "service organization" in which students would "unselfishly" meet the needs of the school.  Unfortunately, the real purpose was to be a service organization for Johnson to selfishly satisfy his own masturbatory fantasies.

50)     By and through its "public relations" strategy, Nicolet, the Board and staff, the Nicolet Defendants and the John Does disseminated, distributed and publicized, and/or caused to be disseminated, distributed and publicized, the "Hosts" at various Nicolet events and performances, thereby continuing to enhance the reputation of Johnson, Nicolet, the Board and staff, the Nicolet Defendants and the John Does, and further the exploitation  and victimization of children under the protection and care of the Defendants.  *See* Article from Shield, dated 1981, attached, restated and incorporated by reference herein as **Exhibit M**; Article from Shield, dated 1982, attached, restated and incorporated by reference herein as **Exhibit N**.

51)     Between in or about 1979 and 1982, Plaintiff Bonchek was member of, and became the "Head" of, the Nicolet "Hosts," during which time he was unknowingly being groomed for sexual exploitation by Johnson, for his sexual fantasies. *See* Article from *Shield*, dated 1980, attached, restated and incorporated by reference herein as **Exhibit O**.

52)     Over the years and decades at Nicolet, as Johnson moved up the ranks in the School's hierarchy and collected various awards and recognition, he became the "go-to" teacher for an entrée by high-performing students seeking a recommendation to an elite or Ivy League college.  By his leveraging and manipulating his ability to provide a recommendation, Johnson used threats and coercion as a means to seduce, intimidate and manipulate Nicolet boys, including but not limited to Bonchek, into becoming unwilling victims of his vile sexual fantasies. His position and power also prevented anyone from speaking up, as it would seem impossible to imagine that someone of his unimpeachable reputation and public service could be guilty of such lascivious behavior.

53)     The son of a nationally recognized cardiac surgeon, between the late 1970's and early 1980's Bonchek was a brilliant, high-achieving student at Nicolet.  *See* Page from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit P**. The Plaintiff was well-regarded by his peers and would graduate as the 1982 Nicolet Valedictorian, while receiving numerous awards and honors, including as "The Johnson's Wax Fund" Scholar; the American Association of Teachers of German National Exam; the American Language and School Society State German Competition; the University of Wisconsin – River Falls Tall Contest – German; Mathematics Award – Braveland Conference Mathematics Meet, with Varsity Team Championship and Individual Honors; the National High School Mathematics Contest; and the University of Wisconsin – Madison Mathematics Science and Engineering Talent Search. *See* Pages from *Shield*, dated 1982, attached, restated and incorporated by reference herein as **Exhibit Q**.

54)     Through his elite performance in mathematics and his participation in the Hosts and in the Magic Company, Johnson quietly began grooming the Plaintiff for his sexual

21

exploitation. Upon information and belief, through Bonchek's freshman and sophomore years, Johnson "encouraged" Bonchek while quietly keeping an eye on him and intending to "develop" the young adolescent into one of his sexual trophies.

55)     In or about the fall of 1980 and during the Plaintiff's junior year at Nicolet, Johnson approached Bonchek and asked him to participate in a "research project" on a certain "statistical analysis" of "physiology," allegedly being conducted by the Defendant. Johnson informed Bonchek that he was conducting a statistical study on the "physiological response" of certain "athletic" activities and asked the Plaintiff to participate.

56)     At the time, Bonchek was actively considering his options for college and desperately wanted to attend an Ivy League university. During such conversations, Johnson threatened, implicitly and/or explicitly, to adjust his recommendation based on Bonchek's participation in the "research project," thereby destroying the Plaintiff's college dreams and hopes. Responding to the coercion and threats, the Plaintiff knew that, if he wanted to get into an Ivy League college, a glowing recommendation from Johnson was "critical." Pressured by the Defendant's threats and extortion, Bonchek was told that the "word was [from the Ivy League admissions officers that] if [Johnson] says you're in," then the Nicolet student gets admitted.

57)     In short, according to the Plaintiff's understanding, "Dave [Johnson] can pick them was basically the word." As a junior in high school, "that meant a lot" to the Plaintiff. Bonchek "figured [that his] … college recommendation was riding on … [Johnson's] recommendation."

58)     Feeling the threats, intimidation and pressure of coercion upon his college hopes and dreams, Bonchek succumbed to the pressure and agreed to "assist" Johnson in his "statistical research" on "physiology." In truth and in fact, the Defendant was manipulating and coercing the Plaintiff for sexual abuse and exploitation.

22

59)     Johnson informed the Plaintiff that the "research" would be conducted on the weekend, at the facilities of Nicolet High School, and that the Defendant would pick Bonchek up, at his home, and drive him to the school.  The Defendant instructed the Plaintiff to bring gym clothes in order to properly participate in the athletics endeavors required by the "statistical research" into a "response" in "physiology."

60)     So, at approximately 10:30 a.m. on the following Saturday, the Defendant picked Bonchek up in his car and drove to Nicolet.  He instructed and caused the Plaintiff to change into gym clothes, and used safety pins in order to pin up the athletic shorts above the Plaintiff's hips. Throughout the process, the Defendant sought to maintain the pretense of "research," by keeping a stopwatch and a journal to record the "data" arising from the "response" of the "physiological statistical analysis."

61)     Once the Plaintiff was attired as Johnson wished, the Defendant began to instruct the Plaintiff to perform certain "exercises" upon Johnson, which quickly became sexual in nature and were designed to create sexual arousal in Johnson.

62)     During the sexual abuse and exploitation, Johnson would be sweating throughout these "exercises," and repeatedly telling Bonchek to "keep going, another minute," until the Defendant reached the peak of arousal and ejaculated.

63)     Then, the "experiment was over" and, feeling shame and self-loathing over the sexual exploitation by the Defendant, the Plaintiff changed and Johnson drove him home.

64)     The sexual abuse of the Plaintiff continued, month after month, throughout the first and second semesters of Bonchek's junior year.  By his express and implicit threats, the Defendant repeatedly sexually abused and victimized the Plaintiff for his vile and disgusting sexual pleasure, while continuing to maintain the facade of conducting "research" into "physiology.  Rumors of

23

Johnson's behavior were commonplace among Nicolet students, and Bonchek frequently had to "play along" while others wondered aloud "who Johnson was bringing up to his cabin this year." Bonchek was terrified that others would find out what was happening, simultaneously destroying both his life as he knew it, and the life he hoped to create for himself in the future. In many ways, the psychological abuse from maintaining the secret to his parents and friends was as traumatic as the physical abuse perpetrated by Johnson. This was in addition to the profound betrayal of trust from someone so admired in the community who professed to be so well-intentioned.

65)     Finally, in or about 1981 and after the second semester, the Defendant provided the Plaintiff with an appropriately sterling college recommendation, commensurate with Bonchek's accomplishments. With the recommendation in hand, Johnson's threats lost their power over Bonchek, and although the effects of the abuse would linger for decades, he became freed of the immediate coercion. Having completed yet another sexual conquest, Johnson stopped victimizing this innocent boy and apparently moved on to another sexual target.

66)     In an attempt to overcome his feelings of self-loathing and worthlessness, Bonchek threw himself back into his studies and graduated from Nicolet as Valedictorian in 1982, and thereafter attended Princeton. Unfortunately, the physical abuse may have been in his past, but the psychological damage only magnified with time.

67)     Meanwhile, Nicolet, the Board and staff, the Nicolet Defendants and the John Does continued to turn a blind eye to the conduct of Johnson and the rumors of impropriety, while promoting his awards and achievements as a positive reflection on the School District.

68)     That "blind eye," however, would soon change, if only briefly.

69)     Mere weeks before a report of sexual abuse upon a student was made to Nicolet, on or about May 6, 1983, Defendant Johnson received an award for "excellence as a secondary

24

instructor and supervisor" by the Wisconsin Mathematics Council. Defendant Nicolet, the Nicolet

Defendants and the John Does cranked up its public relations machinery and praised and promoted

this accomplishment in the Glendale Herald. *See* Glendale Herald Article, dated May 26, 1983,

attached, restated and incorporated by reference herein as **Exhibit R**.

70)    As reported in the Glendale Herald,

"'This distinguished recognition by his colleagues from throughout Wisconsin is a well deserved award.' That statement came from James Reiels, district administrator of Nicolet High School, in reference to an award given to teacher David Johnson.

Johnson was presented the 1983 award for excellence as a secondary instructor and supervisor. The presentation was made by the Wisconsin Mathematics Council at its annual meeting held May 6.

The recognition was based on Johnson's contributions to education as a classroom teacher, in his leadership role at state and national levels in math education, and as an author-lecturer of national repute. According to Reiels, Johnson is one of the most sought after keynote and banquet speakers in the National Council of Teachers of Mathematics. His presentations throughout the country focus on teaching and classroom management techniques for keeping students on task.

Johnson is former president of the Wisconsin Mathematics Council, editor of the Wisconsin Teacher of Mathematics, and program chairman of numerous WMC state meetings.

In his 25th year on the Nicolet High School faculty, he has taught mathematics, served as department chairman and advised the Nicolet Magic Company and the Nicolet Hosts. Other professional activities include serving on several boards of directors, including the National Council of Supervisors of Mathematics. He has served on task forces, state study committees and published a variety of math-oriented articles as well as three books on mathematics education."

*Id.*

71)    It is undisputed that in or about the early summer of 1983, a different Nicolet High

School student and his parents reported sexual abuse by Johnson to a Nicolet staff member. *See*

Correspondence from Dr. Robert Kobylski, Superintendent of Nicolet High School, to David

Johnson, dated March 6, 2018, attached restated and incorporated by reference herein as **Exhibit S**.

72)     Upon information and belief, Nicolet, the Board and staff, the Nicolet Defendants and the John Does were notified of Johnson's sexual abuse and exploitation upon the Nicolet student.

73)     Upon receiving the complaint in or about the summer of 1983, Nicolet, the Board and staff, the Nicolet Defendants and/or the John Does allegedly notified law enforcement of the complaint of sexual abuse upon a minor.

74)     It is undisputed that the Glendale law enforcement has no official record of any such report from Nicolet in or about the summer of 1983.

75)     It is undisputed that on or about July 13, 1983, the Nicolet School Board and/or the Nicolet Defendants and/or the John Does met in closed session with Johnson and confronted the Defendant about his sexual abuse and exploitation of the student. *Id.*

76)     Despite the alleged report to law enforcement and the heinous nature of the sexual abuse by Johnson, Nicolet, the Board and staff and/or the Nicolet Defendants and/or the John Does "agreed to continue [Johnson's] employment under certain conditions." *Id.*

77)     It is undisputed that the letter setting forth such "certain conditions" of the continued employment of Johnson by Nicolet does not exist in the personnel files or elsewhere in the records of Nicolet, and that a fraudulent concealment and cover-up of the crimes of Johnson occurred by Nicolet, the Board and staff, the Nicolet Defendants and/or the John Does.

78)     Indeed, the "blind eye" of Nicolet returned in a matter of days, as the Defendants intentionally and fraudulently concealed and covered-up the sexual abuse and victimization of minors by Johnson, as any disclosure would have seriously harmed the reputation of Nicolet, the

26

Board and staff, the Nicolet Defendants and the John Does. Needless to say, the public relations machinery at Nicolet could not, and would not, easily survive the impact of a scandal and investigation into the famous David Johnson.

79) Solely as an example of the fraudulent concealment, on September 1, 1983, a mere seven (7) weeks after the closed session School Board meeting with Johnson, the Glendale Herald reported, in an article entitled "*Nicolet district head named to national task force*," in pertinent part as follows:

> "James Reiels, administrator of the Nicolet High School District, has been appointed as one of 11 educators who will assess American education from the perspective of its student successes. The two-year study is being underwritten by the Commission on Schools of the North Central Association of College and Schools, which accredits schools, colleges and universities in 19 states.

> Reiels joined Nicolet in 1959 as a teacher. He has been district administrator since 1974.

> The Task Force on Student Success will include in its study the findings of several national reports on education recently published. It will also search out other information needed to answer the key questions:

> - What school experiences contribute to the development of student success?
> - What changes in education programs would help students become more successful in schools?
> - What changes in the organization of education would help students become more successful in school?

> The Task Force includes teachers, administrators and evaluators.

> The North Central Association is the largest of the six regional accrediting associations in the nation with more than 5,000 schools and 900 colleges and universities. The NCA Commission on Schools develops standards for quality education and structures evaluation activities."

*See* Glendale Herald Article, dated September 1, 1983, attached, restated and incorporated by reference herein as **Exhibit T**.

80)     Upon information and belief, Reiels never informed the Task Force or others at the NCA Commission on Schools that protecting students from sexual abuse and exploitation would contribute to the development of student success, or that changes in education programs – such as the firing of sexual predators like Johnson – would help students become more successful in schools.

81)     The pinnacle of the fraudulent concealment, however, followed as in or about October 1983, Johnson was awarded the 1983 Presidential Award for Excellence in Science and Mathematics teaching.  The Defendant was flown to Washington, D.C., along with other teachers, and was honored in a ceremony hosted by President Ronald Reagan.

82)     An article in the Glendale Herald, entitled "*Honored math teacher thrilled*," reported the events, in pertinent part, as follows:

> "'It really was just an unbelievable feeling and experience to be so appreciated,' Johnson said in a recent interview.
>
> 'Without a doubt, it was the greatest professional experience I have had. It was thrilling to be in the same room when the president of the United States stepped in,' he explained. 'When the president walked in, it was exceedingly silent. We all walked up to the stage like a graduation ceremony. He (the president) jumped on to the stage. He was peppy and vigorous, and his speech was excellent.'
>
> "And during all this whole time, you sat there and said, 'My gosh, I'm sitting here in the White House listening to the president of the United States. It was somewhat like a dream….'"

*See* Glendale Herald Article, dated November 24, 1983, attached, restated and incorporated by reference herein as **Exhibit U**.

83)     Indeed, the Nicolet Defendants were more concerned about their personal reputations as compared to the sexual exploitation of children. Solely as an example, in or about June 1989 and after Defendant Reiels announced his impending retirement in the following year, the Nicolet School Board President stated, as follows, to the Glendale Herald:

28

"I think Dr. Reiels has done a wonderful job in what will be his 31 years at Nicolet. The innovations in teaching and curriculum all came through his knowledge and expertise. The school is of national prominence and our graduates are successes due to Dr. Reiels' ability to pick the best teachers available and to have the interest of the kids at heart, and to have expertise in many areas. The reputation of our school speaks for itself."

*See* Glendale Herald Article, dated June 29, 1989, attached, restated and incorporated by reference herein as **Exhibit V**.

84)     Furthermore, two (2) former Nicolet Board Presidents asserted that Defendant Reiels had the "ability to handle delicate and difficult situations with finesse." *Id.* One such former Board President claimed that "when the board and administration faced difficult personnel decisions," Defendant Reiels "had the ability to diffuse tension and bring it to [a] positive resolution." *Id.*

85)     Needless to say, no one asked Bonchek or the other victims of Johnson's sexual abuse and exploitation whether Reiels' fraudulent cover-up and mishandling of the Johnson "personnel decision" resulted in a "positive resolution." One can only assume that the difficult situation handled with finesse was how to maintain the illusion of Johnson's character, protect the reputation of the school, and keep the truth from being known by anyone else. *See also* Glendale Herald Article, dated June 14, 1990, attached, restated and incorporated by reference herein as **Exhibit W**.

86)     Throughout this entire period, the Defendants never disclosed that Johnson was a sexual predator to the victims, to the Nicolet community or to the public. From in or about the early 1980's to and including 1991, when Johnson retired, Nicolet, the Board and staff, the Nicolet Defendants and the John Does fraudulently concealed the sexual depredations of the Chairman of the Mathematics Department, and the Teacher Advisor to the Magic Company and the Hosts.

87)     Moreover, the Defendants continued to perpetrate a fraud and deceit upon the Plaintiff and other victims by publicly touting the accomplishments of Johnson, Nicolet, the Nicolet Defendants and the John Does, for years and decades thereafter.  If the truth had become known, Bonchek and the other victims could have gotten help decades sooner.  Instead, the psychological damage continued to compound as the vicious circle of lies, shame and betrayal formed a tighter and tighter noose around their heart, strangling the sense of self, the ability to trust others, and notion of one's own worth that those who have not suffered abuse take for granted.

88)     In or about 2003, Johnson was arrested for Fourth Degree Sexual Assault, for incidents occurring on or about September 7, 2002 and March 21, 2003, in violation of Wisconsin Statutes §§ 940.225(3m).  The Defendant plead guilty to the criminal sexual assault and was sentenced. *See State of Wisconsin v. David R. Johnson,* Case No. 03CM218 (Circuit Ct., Waupaca Cty.), (public records) attached, restated and incorporated by reference herein as **Exhibit X**.

89)     Upon information and belief, Johnson was never required to register as a sex offender, and the victims and other members of the public were not apprised that the former Chairman of the Mathematics Department at Nicolet was a sexual predator.

90)     On or about March 26, 2018, and after an investigation by the Defendants, Nicolet sent a letter (hereinafter the "Kobylski Letter") to the Nicolet High School Alumni, which concluded that

-     Johnson committed heinous acts of sexual abuse to at least two (2) students during the 1980's;

-     That there was "evidence that the District was made aware of … Johnson's misconduct during the summer of 1983, but allowed him to continue teaching at Nicolet…"

-     At the time, Nicolet and the Nicolet Defendants "clearly should have done much more to protect Nicolet students after being made aware of … Johnson's conduct."

*See* Correspondence from Dr. Kobylski, Superintendent of Nicolet High School to the Nicolet High School Alumni, dated March 26, 2018, attached restated and incorporated by reference herein as **<u>Exhibit Y</u>**.

91) Also on or about March 26, 2018, the Defendants released the "*Summary of Findings of Independent Investigation*," by Joseph M. Russell, Esq. (hereinafter "Investigation Summary"), which confirmed the evidence of the sexual abuse by Johnson, the reported complaint to the Defendants in the summer of 1983 and the closed door session of July 1983. *See Summary of Findings of Independent Investigation*, by Joseph M. Russell, Esq., dated March 26, 2018, attached restated and incorporated by reference herein as **<u>Exhibit Z</u>**.

92) To make matters worse, the Plaintiff cooperated with the Defendants in the investigation, on the condition that the Defendants maintain the confidentiality of his identity.

93) Thus, on or about November 14, 2016, the Parties executed a Non-Disclosure Agreement, as amended, in order to protect the identity of Bonchek, so as to avoid additional mental and emotional suffering as a result of potential disclosure of his identity as a victim of Johnson. *See* Non-Disclosure Agreement, dated November 14, 2016, as attached restated and incorporated by reference herein as **<u>Exhibit AA</u>**.

94) Section 1 of the Non-Disclosure Agreement provides, in pertinent part, as follows:

1) **Confidential Information**. The Parties will maintain as confidential all non-public information and documents provided directly or indirectly by another Party as part of the Discussions and the Investigation. All such non-public information and documents exchanged and provided by any Party to another Party is "Confidential Information."

   (A) The Parties agree during and after the term of this Agreement to *<u>hold in confidence and not to, directly or indirectly, reveal, publish, disclose, or transfer any of the Confidential Information to any other person or entity</u>*, absent subsequent agreement or termination of this Agreement by the Parties. Nicolet agrees not to utilize Confidential Information provided by

31

Bonchek for any purpose, except in Nicolet's Investigation of Johnson's conduct and in consideration and analysis of the opportunities presented by the Discussions and the Investigation, absent subsequent agreement by the Parties.

(B)     The Parties may disclose Confidential Information to its "Representatives" (as defined below) *to the extent necessary* to permit such persons to assist the Party in evaluating the opportunities presented by the Discussions and the Investigation; provided that the Parties shall direct such Representatives to abide by the terms of this Agreement to the same extent as if they were parties.

"Representatives" means, as to any Party, such Party's respective directors, officers and employees who *need to know* in furtherance of the opportunities presented by the Discussions and the Investigation….

Non-Disclosure Agreement (**Exhibit AA**), § 1, at pp. 1-2 (emphasis added).

95)     On or about September 30, 2017, the Plaintiff and Defendant Nicolet executed a certain amendment to the Non-Disclosure Agreement (hereinafter the "Extension Agreement") (collectively, with the Non-Disclosure Agreement, as the "NDA"). *See* Extension Agreement, dated September 30, 2017, as attached restated and incorporated by reference herein as **Exhibit BB.**

96)     Section 1 of the Extension Agreement, as an amendment to the Non-Disclosure Agreement, provides, in pertinent part, as follows:

**1)     Amendment of Paragraph 1(D) of the NON-DISCLOSURE AGREEMENT**. In order to clarify the NON-DISCLOSURE AGREEMENT, the Parties have agreed to amend the NON-DISCLOSURE AGREEMENT with respect to a request for records under Wisconsin's Public Records Law (Wis. Stats. §§ 19.31 – 19.39), by inserting the following provision:

In the event that Nicolet receives a request for records (whether oral or written) pursuant to the Wisconsin Public Records Law (Wis. Stats. §§ 19.35, *et seq.*), it agrees to *comply with the following procedures as relating to Bonchek and/or Confidential Information*, with respect to such request:

(i)     Nicolet shall notify promptly Bonchek and his counsel, in writing (electronically, hard copy or otherwise), and within not more than two (2) business days of the receipt of such request;

32

(ii)     Nicolet agrees to provide copies of all written requests and/or to summarize the details of any oral request to Bonchek and his counsel at the time of notification;

(iii)    Nicolet agrees to provide copies of all potential records containing Confidential Information and all matters relating to Bonchek, within not more than three (3) business days after the identification of such records by Nicolet or its counsel;

(iv)    During its review and evaluation of each such request, Nicolet shall use best efforts, consistent with its obligations under the Wisconsin Public Records Act, (Wis. Stats. §§ 19.31 – 19.39), to maintain, in good faith, the confidentiality of the Confidential Information and all matters relating to Bonchek;

(v)     During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any information provided by Bonchek or his counsel in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(vi)    During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all exemptions and/or exceptions to disclosure, in accordance with Wis. Stat. §§ 19.36(2)-(13) & 19.85 and relevant case law, including those as may be proposed by Bonchek and his counsel, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(vii)   During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all privileges, doctrines, factors and facts relevant to any balancing test which demonstrates that the public interest is outweighed by the interest in nondisclosure of the public records, in accordance with Wis. Stat. § 19.36 and relevant case law, including those as may be as proposed by Bonchek and his counsel, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(viii)  During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all requests for redactions, including those as may be proposed by Bonchek and his counsel of public records, in accordance with Wis. Stat. § 19.31 and relevant case law, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(ix)    During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any information provided by Bonchek or his counsel in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(x)     Prior to the delivery of any response to a requester as to any request for public records containing Confidential Information and/or matters relating to Bonchek, Nicolet shall provide a written draft of its stated reasons of its intended action (whether nondisclosure, redaction, disclosure, or otherwise) to Bonchek and his counsel, and shall consider, in good faith, of any

33

proposed revisions thereto, including those as may be as proposed by Bonchek and his counsel;

(xi)    After the conclusion of its review and evaluation of each such request and as soon as practicable prior to any disclosure, Nicolet shall notify Bonchek and his counsel as to any decision or anticipated decision made by Nicolet that it is required to disclose Confidential Information and/or any matters relating to Bonchek in accordance with the Wisconsin Public Records Law that such disclosure may be required. This notice shall be designed to provide Bonchek and his counsel with adequate notice of the matter, so as to preserve, to the extent practicable, Bonchek's ability and opportunity to take actions to preserve the confidentiality of Confidential Information and/or any matters related to Bonchek;

(xii)    Nicolet shall provide copies of any and all responses and copies of public records (redacted, unredacted or otherwise), including but not limited to denials, responses, statements of reasons, or otherwise, to Bonchek and his counsel contemporaneous with the time of notification to each requester; and

(xiii)    Nicolet shall provide copies of any and all actions or petitions for a writ of mandamus under Wis. Stat. § 19.37(1), and/or applications to the local district attorney or Attorney General, and shall timely cooperate, in good faith with Bonchek and his counsel with respect any such proceedings.

Extension Agreement (**Exhibit BB**), § 1, at pp. 2-3 (emphasis added).

97)    Additionally, the Extension Agreement provided that, "EXCEPT as modified herein, all other terms of the NON-DISCLOSURE AGREEMENT shall continue in full force and effect." *Id*. at p. 4.

98)    Upon information and belief, in or about the fall of 2017 and/or the spring of 2018, the Defendant received certain requests for public records (hereinafter the "Requests") from individuals regarding, *inter alia*, the Plaintiff's Confidential Information, and which Nicolet had a duty and an obligation maintain as confidential under the NDA.

99)    Upon information and belief, after the publication and dissemination of the Kobylski Letter and the Investigation Summary on or about March 26, 2018, certain members of the media and others delivered Requests to Defendant Nicolet seeking, *inter alia*, Confidential Information relating to Plaintiff Bonchek.

100) Upon information and belief, in or about March and April 2018, and thereafter, Defendant Nicolet breached the NDA, failed to timely comply with the public records notifications and distributed and disseminated sufficient information regarding the Plaintiff in order to enable member(s) of the media to identify Bonchek as one of the victims of Johnson, creating further trauma for the Plaintiff in the form of fear, betrayal, and shame.

101) On or about April 4, 2018, a certain member of the media contacted the Plaintiff and informed him that through Nicolet's public records responses, she had determined that Bonchek was the individual referenced in the Kobylski Letter, in the Investigation Summary, and was one of the victims of sexual abuse by Johnson. This reporter stated, in pertinent part, that "[a]s part of our duty as journalists, we made records requests for complaints. Your name was redacted from documents, but other information in your letter to the district lead me to you." *See* Email of Media Member to Mark Bonchek, dated April 4, 2018, attached, restated and incorporated by reference herein as pages 3-4 of **Exhibit CC** (without attachments).

102) By Nicolet's disclosure of Bonchek to the media and its breaches and violations of the NDA in or about March and April 2018, the Defendant intentionally and/or negligently inflicted mental and emotional trauma and distress, with physical manifestations thereon, upon the Plaintiff, or it knew or should have known that emotional distress was the likely or foreseeable result of their actions, practices, and courses of conduct as described herein.

103) Defendant Nicolet's actions, practices and courses of conduct, as described herein, were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of school or educational organization, having sensitive, confidential and personal information including but not limited to, *inter alia*, Confidential Information, as to the sexual abuse and molestation suffered by a former student at the hands of a former teacher in its employ.

35

104) The emotional distress sustained by the Plaintiff and his anguish by the disclosure to the media of his identity and the invasion of his privacy has caused, and continues to cause, damages, injuries and emotional distress to the Plaintiff, with physical manifestations thereof, including headaches, stomach and gastrointestinal pains and distress, and sleeplessness, among others. As a survivor of sexual abuse and violence, Bonchek has experienced a traumatic event by Nicolet's violation of his privacy and breach of the NDA, including but not limited to chronic feelings of anxiety, stress, paranoia and fear, "post-traumatic stress disorder" (PTSD) and severe dissociative disorder.

105) Thus, in or about the spring of 2018 and thereafter, and as a direct and proximate cause of Defendant Nicolet's breach of the NDA and its intentional and negligent infliction of emotional distress, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses.

106) Section 893.80(1d)(a) of the Wisconsin Statutes, provides, in pertinent part, as follows:

> **1d)** …, no action may be brought or maintained against any … , governmental … agency thereof nor against any … official, … or employee … for acts done in their official capacity or in the course of their agency or employment … unless:
>
>> (a) Within 120 days after the happening of the event giving rise to the claim, written notice of the *circumstances of the claim* signed by the party, agent or attorney is served on the … , governmental … agency and on the …, official, … or employee under s. 801.11. *Failure to give the requisite notice shall not bar action on the claim if* the … , agency *had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant* … , agency or to the defendant … official, … or employee;….

Wisc. Stat. § 893.80(1d)(a) (emphasis added).

107)     On or about April 6, 2018 and thereafter, the Plaintiff provided *actual notice, in writing and pursuant to the provisions of Wisc. Stat. § 893.80(1d)(a)*, to Defendant Nicolet of the "circumstances of the claim" regarding the "violation of the Non-Disclosure Agreement (NDA), as amended," and the "breach of his privacy," and the emotional trauma inflicted upon Bonchek, with physical manifestation thereon, in accordance with the provisions of Wisc. Stat. § 893.80. *See* Email of Philip M. Giordano, Esq. to Gary M. Ruesch, Esq., dated April 6, 2018 (**Exhibit CC**), pp. 1-3 (without attachments) (hereinafter the "April 6th Notice" or the "Notice").

108)     In the April 6th Notice, the Plaintiff informed the Defendant that Bonchek had received an email from a reporter the prior evening, and stated, in pertinent part, as follows:

> There are several points in the [reporter's] email which are extremely troubling and appear to be in violation of the Non-Disclosure Agreement (NDA), as amended, between my client and Nicolet.
>
> First, the subject line of the reporter's email is entitled, "*A Difficult Letter.*" This subject line is **identical** to the words in subject line of Mark's email, dated May 13th, 2016, to Dr. Kobylski.
>
> As you know, the May 13th email is the first time Mark informed Nicolet of first time circumstances of the Johnson's criminal activities and sexual abuse at Nicolet High School.

*Id.* (**Exhibit CC**), p. 1 (original bold and underlined).

109)     Additionally, by his April 6th Notice, the Plaintiff noted to Nicolet that the reporter had "made records requests for complaints. [Bonchek's] *name was redacted* from documents, but *other information in your letter to the district lead me to you*…." *Id.* (**Exhibit CC**), p. 1 (original italics and underlined).

110)     Moreover, by his April 6th Notice, the Plaintiff specifically cited to provisions of the NDA and the express notification and procedural protections therein, stating, in pertinent part, as follows:

As you know, Section 1 of the NDA, as amended, provides in pertinent part:

'In the event that Nicolet receives a request for records (whether oral or written) pursuant to the Wisconsin Public Records Law (Wis. Stats. §§ 19.35, *et seq.*), it agrees to comply with the following procedures as relating to Bonchek and/or Confidential Information, with respect to such request:

(i)     Nicolet shall notify promptly Bonchek and his counsel, in writing (electronically, hard copy or otherwise), and within not more than two (2) business days of the receipt of such request;

(ii)    Nicolet agrees to *provide copies of all written requests* and/or to summarize the details of any oral request to Bonchek and his counsel at the time of notification;

(iii)   Nicolet agrees to provide copies of all potential records containing Confidential Information and all matters relating to Bonchek, within not more than three (3) business days after the identification of such records by Nicolet or its counsel;

(iv)    During its review and evaluation of each such request, *Nicolet shall use best efforts*, consistent with its obligations under the Wisconsin Public Records Act, (Wis. Stats. §§ 19.31 – 19.39), *to maintain, in good faith, the confidentiality of the Confidential Information and all matters relating to Bonchek*;

(v)     During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any information provided by Bonchek or his counsel in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(vi)    During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all exemptions and/or exceptions to disclosure, in accordance with Wis. Stat. §§ 19.36(2)-(13) & 19.85 and relevant case law, including those as may be proposed by Bonchek and his counsel, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(vii)   During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all privileges, doctrines, factors and facts relevant to any balancing test which demonstrates that the public interest is outweighed by the interest in nondisclosure of the public records, in accordance with Wis. Stat. § 19.36 and relevant case law, including those as may be as proposed by Bonchek and his counsel, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

(viii)  During its review and evaluation of each such request, Nicolet agrees to cooperate and to consider, in good faith, any and all requests for redactions, including those as may be proposed by Bonchek and his counsel of public records, in accordance with Wis. Stat. § 19.31 and relevant case law, in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek;

38

(ix) During its review and evaluation of each such request, *Nicolet agrees to cooperate and to consider, in good faith, any information provided by Bonchek or his counsel in order to maintain the confidentiality of the Confidential Information and all matters relating to Bonchek*;

(x) *Prior to the delivery of any response to a requester* as to any request for public records containing Confidential Information and/or matters relating to Bonchek, *Nicolet shall provide a written draft of its stated reasons of its intended action (whether nondisclosure, redaction, disclosure, or otherwise) to Bonchek and his counsel*, and shall consider, in good faith, of any proposed revisions thereto, including those as may be as proposed by Bonchek and his counsel;

(xi) After the conclusion of its review and evaluation of each such request and as soon as practicable prior to any disclosure, Nicolet shall notify Bonchek and his counsel as to any decision or anticipated decision made by Nicolet that it is required to disclose Confidential Information and/or any matters relating to Bonchek in accordance with the Wisconsin Public Records Law that such disclosure may be required. This notice shall be designed to provide Bonchek and his counsel with adequate notice of the matter, so as to preserve, to the extent practicable, Bonchek's ability and opportunity to take actions to preserve the confidentiality of Confidential Information and/or any matters related to Bonchek;

(xii) Nicolet *shall provide copies of any and all responses and copies of public records* (redacted, unredacted or otherwise), including but not limited to denials, responses, statements of reasons, or otherwise, to Bonchek and his counsel *contemporaneous with the time of notification to each requester*; and

(xiii) Nicolet shall provide copies of any and all actions or petitions for a writ of mandamus under Wis. Stat. § 19.37(1), and/or applications to the local district attorney or Attorney General, and shall timely cooperate, in good faith with Bonchek and his counsel with respect any such proceedings."

*Id.* (**Exhibit CC**), pp. 1-2 (original italics and underlined).

111) Finally, by his Notice, the Plaintiff specifically informed Nicolet that he was "extremely upset," suffering extreme emotional distress by the "breach of his privacy and violation of the express provisions of the NDA." *Id.* (**Exhibit CC**), p. 3.

112) Unfortunately, Defendant Nicolet has refused and failed to acknowledge its breaches of the NDA, its intentional and negligent infliction of emotional distress, and its invasion of the Plaintiff's privacy, and the disclosure of his Confidential Information to third-parties, including but not limited to a member of the media.

113)    And thus the suffering continued for the victims, including Plaintiff Bonchek, and continues to the present time.

114)    The Defendant's actions and omissions, including but not limited to breaches of the NDA, infliction of emotional distress and invasion of privacy, have caused serious and permanent emotional and mental trauma to the Plaintiff.  As a survivor of sexual abuse and violence, he has already experienced chronic feelings of anxiety, stress, paranoia and fear, and has suffered from PTSD and severe dissociative disorder. Post-traumatic stress disorder is an anxiety disorder that can result from a traumatic event, including sexual violence.   Dissociative disorder is a disconnection of thoughts, feelings and identity, an experience of detachment or feeling as if one is outside one's body, and a loss or suppression of memory.   The Defendant's violations of the NDA, its invasion of privacy and infliction of emotional distress has caused additional severe emotional trauma, with physical manifestations, and harm to the Plaintiff.

115)    With PTSD, the Plaintiff has experienced, and re-experienced, the feelings of being constantly in danger of being betrayed, reliving the events surrounding the abuse through flashbacks, dreams, or intrusive thoughts. The disassociation created a "persona" to protect Bonchek from these feelings. The Plaintiff has experienced "avoidance," by intentionally or subconsciously changing his behavior in order to avoid scenarios associated with the sexual abuse at Nicolet or losing interest in activities he used to enjoy. The Plaintiff has suffered from hyper-arousal, and feeling "on edge" all of the time, like an undercover agent always afraid of his cover being blown.  Until very recently, he did not recognize himself in the mirror and did not believe that his own feelings and desires were worthy of consideration by others.  While on the outside, the Plaintiff appears a confident and accomplished man, this is in fact a shell, hiding a scared and

40

damaged teenager, whose feelings and identity were frozen in 1982 when Johnson betrayed and abused him and the Defendants protected the perpetrator and conspired to keep it a secret.

116)     At all times relevant herein, Defendant Nicolet has breached its contract with the Plaintiff, has invaded his privacy, has inflicted of emotional distress, and has committed actions and omissions which were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of school or educational organization, having sensitive and personal information including but not limited to, *inter alia*, Confidential Information, as to the sexual abuse and molestation suffered by a former student at the hands of a former teacher in its employ and protected by a Non-Disclosure Agreement.

117)     At all times relevant herein, the Plaintiff's severe physical injuries, mental and emotional trauma and distress, loss of earnings, and medical expenses were foreseeable as arising and the result of the Defendants' breaches of contract and violations of law, in its duty of care as owed to the Plaintiff in the protection of his Confidential Information.

118)     At all times relevant herein, the Defendants' breaches and violations of law were the proximate cause of Bonchek's severe physical injuries, mental and emotional trauma and distress, loss of earnings, and medical expenses.

119)     In sum, as a result of the Defendants' violations of law, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, loss of consortium, medical and/or health-related expenses, and together with costs, attorneys' fees and interest. Furthermore, the Plaintiff respectfully requests that he be awarded their general, compensatory, consequential and/or special damages and losses, costs, interest, multiple and/or punitive damages, reasonable attorneys' fees, and any such other relief as this Honorable Court deems just and appropriate.

# V. <u>CAUSES OF ACTION</u>

## COUNT I – DENIAL OF DUE PROCESS / VIOLATIONS OF 42 U.S.C.
## § 1983 AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
## <u>(As to Johnson, Nicolet, Nicolet Defendants and John Does 1 – 100)</u>[1]

120) The Plaintiff reasserts Paragraphs 1 through 119 above, with **<u>Exhibits</u>**, and restate and incorporate them by herein by reference.

121) It is undisputed that Defendant Johnson violated Plaintiff's constitutional right to bodily integrity under the Due Process Clause of the Fourteenth Amendment.

122) By failing to investigate or supervise and fraudulently concealing and covering up Johnson's deviant sexual conduct towards students in his care, the Defendants' violated Plaintiff's constitutional right to bodily integrity under the Due Process Clause of the Fourteenth Amendment.

123) As a municipal governmental organization, duly organized and operating pursuant to the color of State law, Defendant Nicolet owns and operates Nicolet High School, and the Nicolet Defendants and John Does 1-100 positions on the School Board, as school administrators, staff, and employees, all Defendants were acting under color of Wisconsin State law.

124) The Plaintiff continuously and repeatedly had his bodily integrity violated by Johnson, in contravention of the U.S. Constitution and the 42 U.S.C. § 1983, and was subjected to a clear and persistent pattern of sexual abuse, sexual molestations, sexual harassment, and other inappropriate conduct by Johnson, a Nicolet employee, and the other Defendants, acting under the color of State law.

125) By their conduct, as described herein, Nicolet, the Nicolet Defendants and the John Does violated Plaintiff Bonchek's Due Process rights as guaranteed by the U.S. Constitution and

---

[1] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

the 42 U.S.C. § 1983.

126)     The Defendants knew and/or had reason to know of Johnson's illegal and improper conduct concerning its students, and refused and failed to act to prevent the same. Upon receiving actual notice of Johnson's sexual molestation in or about 1983, the Defendants continued their fraudulent and illicit concealment and cover-up, to the detriment of Plaintiff Bonchek and the other Nicolet students.

127)     The Defendants intentionally, recklessly and/or negligently ignored and refused to prevent Johnson's molestation and deviant sexual behavior, and failed to terminate his employment and / or deny him access to young male students in his care, thereby condoning and approving, expressly and/or implicitly, and the denial of Due Process, in violation of the U.S. Constitution and 42 U.S.C. § 1983.

128)     Furthermore, the Defendants acted with deliberate indifference and willful and conscious disregard for the health, safety and welfare the Plaintiff and other Nicolet students when they refused and failed to act, to protect, to investigate and /or to prevent further harm from occurring, resulting in an unreasonable risk to the health, safety and welfare of the Plaintiff and other Nicolet students.

129)     By their inaction and indifference, fraudulent concealment and prioritization of the reputation of Nicolet and themselves over the safety and well-being of their students, the Defendants encouraged a climate to flourish where innocent children and students were victimized by a sexual predator, Defendant Johnson.

130)     By their inaction and indifference, fraudulent concealment and prioritization of the reputation of Nicolet and themselves over the health, safety and well-being of their students, the Defendants caused the Plaintiff and other students to continue to be subjected to Johnson's

sexually deviant and outrageous misconduct.

131)    This deliberate indifference and conscious disregard for the Plaintiff's rights directly and proximately caused constitutional harms to the Plaintiff, including further violations of his right to bodily integrity and the right to be free from continued and ongoing sexual molestation, sexual harassment, inappropriate touching and mental, emotional and physical abuse.

132)    As a direct and proximate cause of the Defendants' denial of Due Process under the color of State law and violations of the U.S. Constitution and 42 U.S.C. § 1983, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages.

### COUNT II – DENIAL OF EQUAL PROTECTION / VIOLATIONS OF 42 U.S.C. § 1983 AND FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION (As to Johnson, Nicolet, Nicolet Defendants and John Does 1 – 100)[2]

133)    The Plaintiff reasserts Paragraphs 1 through 132 above, with **Exhibits**, and restate and  incorporate them by herein by reference.

134)    It is undisputed that Defendant Johnson violated Plaintiff's constitutional right to bodily integrity under the Equal Protection Clause of the Fourteenth Amendment.

135)    By failing to investigate or supervise and fraudulently concealing and covering up Johnson's deviant sexual conduct towards students in his care, the Defendants' violated Plaintiff's constitutional right to bodily integrity under the Equal Protection Clause of the Fourteenth Amendment.

136)    As a municipal governmental organization, duly organized and operating pursuant to the color of State law, Defendant Nicolet owns and operates Nicolet High School, and the

---

[2] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

Nicolet Defendants and John Does 1-100 positions on the School Board, as school administrators, and employees, all Defendants were acting under color of Wisconsin State law.

137)    The Plaintiff continuously and repeatedly had his bodily integrity violated by Johnson, in contravention of the U.S. Constitution and the 42 U.S.C. § 1983, and was subjected to a clear and persistent pattern of sexual abuse, sexual molestations, sexual harassment, and other inappropriate conduct by Johnson, a Nicolet employee, and the other Defendants, acting under the color of State law.

138)    By their conduct, as described herein, Nicolet, the Nicolet Defendants and the John Does violated Plaintiff Bonchek's Equal Protection rights as guaranteed by the U.S. Constitution and the 42 U.S.C. § 1983.

139)    The Defendants knew and/or had reason to know of Johnson's illegal and improper conduct concerning its students, and refused and failed to act to prevent the same. Upon receiving actual notice of Johnson's sexual molestation in or about 1983, the Defendants continued their fraudulent and illicit concealment and cover-up, to the detriment of Plaintiff Bonchek and the other Nicolet students.

140)    The Defendants intentionally, recklessly and/or negligently ignored and refused to prevent Johnson's molestation and deviant sexual behavior, and failed to terminate his employment and / or deny him access to young male students in his care, thereby condoning and approving, expressly and/or implicitly, and the denial of Equal Protection, in violation of the U.S. Constitution and 42 U.S.C. § 1983.

141)    Furthermore, the Defendants acted with deliberate indifference and willful and conscious disregard for the safety and well-being the Plaintiff and other Nicolet students when they refused and failed to act, to protect, to investigate and /or to prevent further harm from

45

occurring, resulting in an unreasonable risk to the health, safety and welfare of the Plaintiff and other Nicolet students.

142)    By their inaction and indifference, fraudulent concealment and prioritization of the reputation of Nicolet and themselves over the health, safety and welfare of their students, the Defendants encouraged a climate to flourish where innocent children and students were victimized by a sexual predator, Defendant Johnson.

143)    By their inaction and indifference, fraudulent concealment and prioritization of the reputation of Nicolet and themselves over the health, safety and welfare of their students, the Defendants caused the Plaintiff and other students to continue to be subjected to Johnson's sexually deviant and outrageous misconduct.

144)    This deliberate indifference and conscious disregard for the Plaintiff's rights directly and proximately caused constitutional harms to the Plaintiff, including further violations of his right to bodily integrity and the right to be free from continued and ongoing sexual molestation, sexual harassment, inappropriate touching and mental, emotional and physical abuse.

145)    Under the Fourteenth Amendment, the Plaintiff had the right as a public-school student to personal security, bodily integrity, and Equal Protection of Laws.

146)    The Defendants each subjected the Plaintiff to violations of his right to personal security, bodily integrity, and Equal Protection of Laws by: failing to investigate Johnson's misconduct; failing to appropriately discipline Johnson; failing to adequately train and supervise Johnson; and manifesting deliberate indifference to the sexual assault and ongoing harassment of the Plaintiff and other students by Johnson.

147)    Defendant Nicolet had unconstitutional customs, policies, practices and/or procedures of (a) failing to investigate evidence of criminal and tortious misconduct against

Nicolet students of their right to personal security and bodily integrity, and (b) failing to adequately train and supervise the School District employees with regard to maintaining, preserving and protecting students from violations of their right to personal security, bodily integrity, and Equal Protection of the Laws.

148)    The Defendants followed these unconstitutional customs, policies, practices and/or procedures not only with regard to the Plaintiff, but also with regard to criminal and tortious misconduct committed against other students.

149)    Defendant Nicolet's customs, policies, practices and/or procedures constituted disparate treatment of males and had a disparate impact on its young male students.

150)    As a direct and proximate cause of the Defendants' denial of Equal Protection under the color of State law and violations of the U.S. Constitution and 42 U.S.C. § 1983, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages.

### COUNT III - VIOLATIONS OF 42 U.S.C. § 1983:
### <u>LIABILITY FOR FAILURE TO HIRE, TRAIN AND SUPERVISE</u>
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)[3]

151)    The Plaintiff reasserts Paragraphs 1 through 150 above, with **<u>Exhibits</u>**, and restate and  incorporate them by herein by reference.

152)    A municipal government or agency, such as Defendant Nicolet, may be liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a custom, policy, practice and/or procedure – i.e., a "policy" - of the local government's legislative body or of those local officials whose acts may fairly be said to be those of the

---

[3] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

municipality.

153)     For liability to arise under Section 1983, an employee must be acting pursuant to such municipal "policy."

154)     To establish a municipal "policy," a plaintiff must prove that the municipal action was (i) taken with the requisite degree of culpability and (ii) causally linked to the deprivation of a federal right.

155)     The Defendants were "state actors" working for Nicolet, a state and federally funded school system, owned and operated pursuant to State law for municipalities.

156)     The Defendants acted under "color of State law" when they fraudulently concealed, refused to investigate and consistently maintained Johnson's employ – indeed, praised him as a superlative member of the Nicolet staff, while having actual notice of his deviant conduct – and thereby encouraging, condoning and accepting Johnson's sexual abuse of young male students on the school premises.

157)     Under the Fourteenth Amendment, the Plaintiff had the right to equal access to an educational environment free from physical, mental and emotional harassment and discrimination.

158)     The Defendants knew or should have known that their conduct and response to sexual assault allegations must comply with federal law, Section 1983 and the U.S. Constitution.

159)     The Defendants violated Plaintiff's right to equal access as described herein, including but not limited to (a) by refusing and failing to take immediate and appropriate action to investigate, prevent, and /or otherwise protect students within its care from sexual abuse by one of its employees, and (b) refusing and failing to take prompt and effective steps to end the sexual abuse, prevent its recurrence, and address its effects.

160)     The Defendants' violated Plaintiff's Fourteenth Amendment rights by failing to

properly hire, train and supervise its employees as required by federal law and the U.S. Constitution.

161)    As a direct and proximate cause of the Defendants' violations of the U.S. Constitution and 42 U.S.C. § 1983, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages.

### COUNT IV - VIOLATIONS OF 42 U.S.C. § 1985: CONSPIRACY TO DEPRIVE PLAINTIFF'S RIGHTS TO EQUAL PROTECTION OF THE LAWS IN VIOLATION OF THE FOURTEENTH AMENDMENT
(As to Nicolet, Nicolet Defendants and John Does 1 – 100)[4]

162)    The Plaintiff reasserts Paragraphs 1 through 161 above, with **Exhibits**, and restate and  incorporate them by herein by reference.

163)    The Defendants were employees of Nicolet and at all relevant times hereto were acting under color of State law and within the scope of each of their respective vested, actual, and/or apparent authority.

164)    The Defendants have collectively conspired for the purpose of depriving, either directly or indirectly, Plaintiffs and other students of the equal protection of the laws and/ or equal privileges and immunities under the laws.

165)    As described herein, the Defendants have committed acts in furtherance of the conspiracy by fraudulently concealing and covering-up the allegations against Johnson, by continuing to employ Johnson after notice, actual and apparent, of his sexual abuse and molestation of Nicolet students, and by fraudulently concealing such allegations, and/or destroying and/or failing to preserve records of such allegations.

166)    The Plaintiff has been injured and deprived of rights and privileges secured by the

---

[4] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

law as a result of Defendants' actions, omissions and fraudulent concealment.

167) The Defendants committed these acts in order to maintain not only the School's pristine reputation but also Johnson's; and allowing Johnson to continue to be employed by the School until his retirement and not investigating the allegations in a timely manner were in furtherance of that goal.

168) As a direct and proximate cause of the Defendants' conspiracy to deprive the Plaintiff of Equal Protection under the Laws and violations of the U.S. Constitution and 42 U.S.C. § 1985, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT V - NEGLIGENCE
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
### (NEGLIGENCE - HIRING)[5]

169) The Plaintiff reasserts Paragraphs 1 through 168 above, with **Exhibits**, and restate and incorporate them herein by reference.

170) The Defendants had a duty to the Plaintiff to hire Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

171) The Defendants were negligent in hiring Johnson and in their actions and omissions, as set forth above.

172) The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

173) The Defendants' negligence was the proximate cause of the harm and injuries and

---

[5] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

50

damages as suffered by the Plaintiff.

174)     As a direct and proximate cause of the Defendants' negligence in the hiring of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT VI - NEGLIGENCE
### <u>(As to Nicolet, Nicolet Defendants and John Does 1 – 100)</u>
### (NEGLIGENCE - RETENTION)[6]

175)     The Plaintiff reasserts Paragraphs 1 through 174 above, with **<u>Exhibits</u>**, and restate and incorporate them herein by reference.

176)     The Defendants had a duty to the Plaintiff to retain Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

177)     The Defendants were negligent in retaining Johnson and in their actions and omissions, as set forth above.

178)     The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

179)     The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

180)     As a direct and proximate cause of the Defendants' negligence in the retention of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs,

---

[6] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

attorneys' fees and interest, to his detriment.

## COUNT VII - NEGLIGENCE
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
### (NEGLIGENCE - SUPERVISION)[7]

181)     The Plaintiff reasserts Paragraphs 1 through 180 above, with **Exhibits**, and restate and incorporate them herein by reference.

182)     The Defendants had a duty to the Plaintiff to supervise Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

183)     The Defendants were negligent in their supervision of Johnson and in their actions and omissions, as set forth above.

184)     The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

185)     The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

186)     As a direct and proximate cause of the Defendants' negligence in the supervision of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT VIII - NEGLIGENCE
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
### (NEGLIGENCE – FAILURE TO WARN)[8]

187)     The Plaintiff reasserts Paragraphs 1 through 186 above, with **Exhibits**, and restate and incorporate them herein by reference.

---

[7] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.
[8] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

188)    The Defendants had a duty to warn the Plaintiff as to the misconduct of Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

189)    The Defendants were negligent in their failure to warn the Plaintiff as to the misconduct of Johnson and in their actions and omissions, as set forth above.

190)    The harm to the Plaintiff as a result of the Defendants' negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

191)    The Defendants' negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

192)    As a direct and proximate cause of the Defendants' negligence and failure to warn as to the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT IX – GROSS NEGLIGENCE
### <u>(As to Nicolet, Nicolet Defendants and John Does 1 – 100)</u>
### (GROSS NEGLIGENCE - HIRING)[9]

193)    The Plaintiff reasserts Paragraphs 1 through 192 above, with **<u>Exhibits</u>**, and restate and incorporate them herein by reference.

194)    The Defendants had a duty to the Plaintiff to hire Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

195)    The Defendants were grossly negligent, reckless and wanton in hiring Johnson and in their actions and omissions, as set forth above.

---

[9] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

196)     The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

197)     The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

198)     As a direct and proximate cause of the Defendants' gross negligence in the hiring of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT X – GROSS NEGLIGENCE
### (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
### (GROSS NEGLIGENCE - RETENTION)[10]

199)     The Plaintiff reasserts Paragraphs 1 through 198 above, with **Exhibits**, and restate and incorporate them herein by reference.

200)     The Defendants had a duty to the Plaintiff to retain Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

201)     The Defendants were grossly negligent, reckless and wanton in retaining Johnson and in their actions and omissions, as set forth above.

202)     The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

203)     The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

204)     As a direct and proximate cause of the Defendants' gross negligence in the retention

---

[10] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT XI – GROSS NEGLIGENCE
### <ins>(As to Nicolet, Nicolet Defendants and John Does 1 – 100)</ins>
### (GROSS NEGLIGENCE - SUPERVISION)[11]

205)    The Plaintiff reasserts Paragraphs 1 through 204 above, with **<ins>Exhibits</ins>**, and restate and incorporate them herein by reference.

206)    The Defendants had a duty to the Plaintiff to supervise Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

207)    The Defendants were grossly negligent, reckless and wanton in their supervision of Johnson and in their actions and omissions, as set forth above.

208)    The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

209)    The Defendants' gross negligence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

210)    As a direct and proximate cause of the Defendants' gross negligence in the supervision of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

---

[11] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

55

## COUNT XII – GROSS NEGLIGENCE
## (As to Nicolet, Nicolet Defendants and John Does 1 – 100)
## (GROSS NEGLIGENCE – FAILURE TO WARN)[12]

211)    The Plaintiff reasserts Paragraphs 1 through 210 above, with **Exhibits**, and restate and incorporate them herein by reference.

212)    The Defendants had a duty to warn the Plaintiff as to the misconduct of Johnson in accordance with the standard of educators and high schools so as to not cause harm or injuries to the Plaintiff.

213)    The Defendants were grossly negligent, reckless and wanton in their failure to warn the Plaintiff as to the misconduct of Johnson and in their actions and omissions, as set forth above.

214)    The harm to the Plaintiff as a result of the Defendants' gross negligence, and their actions, courses of conduct and omissions was reasonably foreseeable.

215)    The Defendants' gross neglicence was the proximate cause of the harm and injuries and damages as suffered by the Plaintiff.

216)    As a direct and proximate cause of the Defendants' gross negligence and failure to warn as to the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XIII – INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS (All Defendants)[13]

217)    The Plaintiff reasserts Paragraphs 1 through 216 above, with **Exhibits**, and restate and incorporate them herein by reference.

---

[12] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.
[13] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

56

218) As set forth above, the Defendants intentionally sought to inflict mental and emotional trauma and distress, with physical manifestations thereon, upon the Plaintiff, or they knew or should have known that emotional distress was the likely or foreseeable result of their actions, practices, and courses of conduct as described herein.

219) The Defendants' actions, practices and courses of conduct, as described herein, were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of teachers and educators, in the protection and care of students and minors.

220) The emotional distress sustained by the Plaintiff and his anguish at having to decide whether to submit by the demands of Defendant Johnson and the sexual abuse and exploitation, and/or the continued distress arising from the fraud and deceit of the Defendants in falsely touting and promoting Johnson in the media and to the Nicolet community.

221) As a direct and proximate cause of Defendants' intentional infliction of mental and emotional trauma and distress and the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XIV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (All Defendants)[14]

222) The Plaintiff reasserts Paragraphs 1 through 221 above, with **Exhibits**, and restate and incorporate them herein by reference.

223) The Defendants were negligent, reckless, and/or grossly negligent in their actions, practices, and courses of conduct as described herein.

---

[14] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

224) These Defendants knew or should have known that mental and emotional trauma and distress was the likely or foreseeable result of their actions, practices, and course of conduct as described herein.

225) The actions, practices, and courses of conduct of these Defendants were the cause of the Plaintiff's mental and emotional trauma and distress, with physical manifestations.

226) The mental and emotional trauma and distress sustained by the Plaintiff was of such nature that a reasonable person would have suffered emotional distress, with physical manifestations, under the circumstances.

227) As a direct and proximate cause of Defendants' negligent infliction of mental and emotional trauma and distress and the misconduct of Johnson, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XV – BREACH OF CONTRACT
### (as to Defendant Nicolet only)[15]

228) The Plaintiff reasserts Paragraphs 1 through 227 above, with **Exhibits**, and restate and incorporate them herein by reference.

229) The Plaintiff and Nicolet entered into an NDA, in or about November 2016, as amended in or about September 2017.

230) Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "maintain as confidential all non-public information and documents provided directly or indirectly by" the Plaintiff to the Defendant, as part of its Investigation into allegations of sexual abuse by Johnson.

---

[15] Amended in accordance with December 23rd Order, as referenced above.

58

231)   Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "*hold in confidence and not to, directly or indirectly, reveal, publish, disclose, or transfer any of the Confidential Information to any other person or entity*, … except in Nicolet's Investigation of Johnson's conduct…."

232)   In or about September 2017, Defendant Nicolet agreed to extend and amend the Non-Disclosure Agreement and the amended NDA provided numerous notice protections and procedural requirements as to public records requests, for the protection of the Plaintiff.

233)   The Plaintiff performed his duties and obligations under the NDA, as amended and in good faith.

234)   As set forth above, between in or about 2017 and in or about 2018, Defendant Nicolet breached the NDA, and disclosed Confidential Information about the Plaintiff to third-parties, including but not limited to a member of the media.

235)   On or about April 6, 2018 and thereafter, the Plaintiff provided actual notice, in writing and pursuant to the provisions of Wisc. Stat. § 893.80(1d)(a), to Defendant Nicolet of the "circumstances of the claim" regarding the "violation of the Non-Disclosure Agreement (NDA), as amended," and the "breach of his privacy," and the emotional trauma inflicted upon Bonchek, with physical manifestation thereon, in accordance with the provisions of Wisc. Stat. § 893.80.

236)   As a direct and proximate cause of the breach of contract of Defendant Nicolet, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

59

## COUNT XVI – BREACH OF IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING (as to Nicolet only)[16]

237)    The Plaintiff reasserts Paragraphs 1 through 236 above, with **Exhibits**, and restate and incorporate them herein by reference.

238)    A covenant of good faith and fair dealing was implied and existed in the NDA and in the contractual relationship between the Plaintiff and Nicolet.

239)    Defendant Nicolet had a duty of good faith and fair dealing in its dealings with the Plaintiff and pursuant to the NDA executed with the Plaintiff for the purpose of inducing him to contract and cooperate with the Defendant.

240)    As set forth above, between in or about 2017 and in or about 2018, Defendant Nicolet breached the NDA, and disclosed Confidential Information about the Plaintiff to third-parties, including but not limited to a member of the media.

241)    On or about April 6, 2018 and thereafter, the Plaintiff provided actual notice, in writing and pursuant to the provisions of Wisc. Stat. § 893.80(1d)(a), to Defendant Nicolet of the "circumstances of the claim" regarding the "violation of the Non-Disclosure Agreement (NDA), as amended," and the "breach of his privacy," and the emotional trauma inflicted upon Bonchek, with physical manifestation thereon, in accordance with the provisions of Wisc. Stat. § 893.80.

242)    As a direct and proximate cause of the breach of the implied covenant of good faith and fair dealing by Defendant Nicolet, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

---

[16] Amended in accordance with December 23rd Order, as referenced above.

## COUNT XVII –
## NEGLIGENT MISREPRESENTATION (All Defendants)[17]

243)    The Plaintiff reasserts Paragraphs 1 through 242 above, with **Exhibits**, and restate and incorporate them herein by reference.

244)    The Defendants negligently concealed and misrepresented the sexual abuse, exploitation and misconduct of Johnson to the Plaintiff and to others, including but not limited by and through their public relations activities.

245)    The conduct of the Defendants as described herein constitutes negligent misrepresentation in that the Defendants negligently published, disseminated and provided the Plaintiff and others with erroneous and misleading information, and negligently omitted material information with a duty to disclose regarding the sexual abuse, exploitation and misconduct of Johnson, to the Plaintiff's detriment.

246)    As a direct and proximate cause of the Defendants' negligent misrepresentations, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XVIII -
## FRAUD AND DECEIT (All Defendants)[18]

247)    The Plaintiff reasserts Paragraphs 1 through 246 above, with **Exhibits**, and restate and incorporate them herein by reference.

---

[17] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.
[18] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

248) The Defendants fraudulently concealed and misrepresented the sexual abuse, exploitation and misconduct of Johnson to the Plaintiff and to others, including but not limited by and through their public relations activities.

249) The actions of the Defendants described herein constitute fraud and deceit, including but not limited to the following:

a) the Defendants made false representations of material facts, and/or omitted material facts with a duty of disclosure, regarding the sexual abuse, exploitation and misconduct of Johnson, knowing or having reason to know of their falsity;

b) the Defendants made said fraudulent misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff and others; and

c) the Plaintiff and others did rely upon said misrepresentations and omissions, to their detriment.

250) As a direct and proximate cause of the Defendants' fraud and deceit, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XIX – CIVIL CONSPIRACY (All Defendants).[19]

251) The Plaintiff reasserts Paragraphs 1 through 250 above, with **Exhibits**, and restate and incorporate them herein by reference.

---

[19] *Subject to* December 23rd Order, as referenced above; *see* ¶ 2, at p.2, *supra*.

252) The Defendants, together with others, combined, conspired, acted in concert, and/or engaged in a conspiracy by entering into an agreement with unlawful motives and/or means, and undertook overt acts towards the ends of such conspiracy.

253) In order to attain of the outcome of its conspiracy, the Defendants required coordination and actions to be taken in unison and/or in concert, together with joint tortious activity of the other co-conspirators.

254) The Defendants had the particular power and/or authority in their business and business relationships to force, coerce, and/or encourage others to participate in this conspiracy and result in retaliation and the termination of the Plaintiff's employment.

255) As set forth above, Johnson performed acts and omissions herein alleged pursuant to, and in furtherance of, a conspiracy with Nicolet, the Nicolet Defendants and/or the John Does.

256) The Defendants furthered the conspiracy by lending aid and encouragement to the other Defendants and ratifying and adopting the acts of their co-conspirators.

257) As a direct and proximate cause of the Defendants' civil conspiracy, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## COUNT XX – INVASION OF PRIVACY AS TO NDA
## VIOLATIONS & CONFIDENTIAL INFORMATION DISCLOSURE
### (as to Nicolet only)[20]

258) The Plaintiff reasserts Paragraphs 1 through 257 above, with **Exhibits**, and restate and incorporate them herein by reference.

---

[20] Amended in accordance with footnote 10, p. 25 of the December 23rd Order, as referenced above.

Case 2:19-cv-00425-JPS   Filed 01/06/20   Page 63 of 72   Document 47

259)    Pursuant to the law of the State of Wisconsin, the Plaintiff had a right against unreasonable, substantial or serious interference with his privacy by Defendant Nicolet.

260)    The Plaintiff and Nicolet entered into an NDA, in or about November 2016, as amended in or about September 2017.

261)    Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "maintain as confidential all non-public information and documents provided directly or indirectly by" the Plaintiff to the Defendant, as part of its Investigation into allegations of sexual abuse by Johnson.

262)    Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "*hold in confidence and not to, directly or indirectly, reveal, publish, disclose, or transfer any of the Confidential Information to any other person or entity*, … except in Nicolet's Investigation of Johnson's conduct…."

263)    In or about September 2017, Defendant Nicolet agreed to extend and amend the Non-Disclosure Agreement and the amended NDA provided numerous notice protections and procedural requirements as to public records requests, for the protection of the Plaintiff.

264)    The Plaintiff performed his duties and obligations under the NDA, as amended and in good faith.

265)    As set forth above, between in or about 2017 and in or about 2018, Defendant Nicolet breached the NDA, and disclosed Confidential Information about the Plaintiff to third-parties, including but not limited to a member of the media.

266)    By its breach of the NDA and, *inter alia*, its disclosure of the Plaintiff's Confidential Information, the Defendant caused unreasonable, substantial and/or serious interference with the Plaintiff's right of privacy.

267) By its breach of the NDA and, *inter alia*, its disclosure of the Plaintiff's Confidential Information, Defendant Nicolet breached, invaded and/or interfered with the Plaintiff's right of privacy.

268) As a direct and proximate cause of Defendant Nicolet's invasion of privacy, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

### COUNT XXI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AS TO NDA VIOLATIONS & CONFIDENTIAL INFORMATION DISCLOSURE
### (as to Nicolet only)[21]

269) The Plaintiff reasserts Paragraphs 1 through 268 above, with **Exhibits**, and restate and incorporate them herein by reference.

270) The Plaintiff and Nicolet entered into an NDA, in or about November 2016, as amended in or about September 2017.

271) Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "maintain as confidential all non-public information and documents provided directly or indirectly by" the Plaintiff to the Defendant, as part of its Investigation into allegations of sexual abuse by Johnson.

272) Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "*hold in confidence and not to, directly or indirectly, reveal, publish, disclose, or transfer any of the Confidential Information to any other person or entity*, … except in Nicolet's Investigation of Johnson's conduct…."

---

[21] Amended in accordance with footnote 10, p. 25 of the December 23rd Order, as referenced above.

273)     In or about September 2017, Defendant Nicolet agreed to extend and amend the Non-Disclosure Agreement and the amended NDA provided numerous notice protections and procedural requirements as to public records requests, for the protection of the Plaintiff.

274)     The Plaintiff performed his duties and obligations under the NDA, as amended and in good faith.

275)     As set forth above, between in or about 2017 and in or about 2018, Defendant Nicolet breached the NDA, and disclosed Confidential Information about the Plaintiff to third-parties, including but not limited to a member of the media.

276)     As set forth above, the Defendant intentionally sought to inflict mental and emotional trauma and distress, with physical manifestations thereon, upon the Plaintiff, or Nicolet knew or should have known that emotional distress was the likely or foreseeable result of its actions, practices, and courses of conduct as described herein.

277)     Defendant Nicolet's actions, practices and courses of conduct, as described herein, were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of school or educational organization, having sensitive and personal information including but not limited to, *inter alia*, Confidential Information, as to the sexual abuse and molestation suffered by a former student at the hands of a former teacher in its employ.

278)     The Defendant knew or should have known that mental and emotional trauma and distress was the likely or foreseeable result of its actions, practices, and course of conduct as described herein.

279)     The actions, practices, and courses of conduct of Defendant Nicolet were the cause of the Plaintiff's mental and emotional trauma and distress, with physical manifestations.

280)     The mental and emotional trauma and distress sustained by the Plaintiff was of such nature that a reasonable person would have suffered emotional distress, with physical manifestations, under the circumstances.

281)     As a direct and proximate cause of Defendant Nicolet's intentional infliction of mental and emotional trauma and distress, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

**COUNT XXII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AS TO NDA VIOLATIONS & CONFIDENTIAL INFORMATION DISCLOSURE**
**(as to Nicolet only)[22]**

282)     The Plaintiff reasserts Paragraphs 1 through 281 above, with **Exhibits**, and restate and incorporate them herein by reference.

283)     The Plaintiff and Nicolet entered into an NDA, in or about November 2016, as amended in or about September 2017.

284)     Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "maintain as confidential all non-public information and documents provided directly or indirectly by" the Plaintiff to the Defendant, as part of its Investigation into allegations of sexual abuse by Johnson.

285)     Under the Non-Disclosure Agreement, Defendant Nicolet agreed to "*hold in confidence and not to, directly or indirectly, reveal, publish, disclose, or transfer any of the Confidential Information to any other person or entity*, … except in Nicolet's Investigation of Johnson's conduct…."

---

[22] Amended in accordance with footnote 10, p. 25 of the December 23rd Order, as referenced above.

286)     In or about September 2017, Defendant Nicolet agreed to extend and amend the Non-Disclosure Agreement and the amended NDA provided numerous notice protections and procedural requirements as to public records requests, for the protection of the Plaintiff.

287)     The Plaintiff performed his duties and obligations under the NDA, as amended and in good faith.

288)     As set forth above, between in or about 2017 and in or about 2018, Defendant Nicolet breached the NDA, and disclosed Confidential Information about the Plaintiff to third-parties, including but not limited to a member of the media.

289)     As set forth above, the Defendant negligently or recklessly sought to inflict mental and emotional trauma and distress, with physical manifestations thereon, upon the Plaintiff, or Nicolet knew or should have known that emotional distress was the likely or foreseeable result of its actions, practices, and courses of conduct as described herein.

290)     Defendant Nicolet's actions, practices and courses of conduct, as described herein, were extreme, intolerable and outrageous, were beyond all possible bounds of a responsible conduct of school or educational organization, having sensitive and personal information including but not limited to, *inter alia*, Confidential Information, as to the sexual abuse and molestation suffered by a former student at the hands of a former teacher in its employ.

291)     The Defendant knew or should have known that mental and emotional trauma and distress was the likely or foreseeable result of its actions, practices, and course of conduct as described herein.

292)     The actions, practices, and courses of conduct of Defendant Nicolet were the cause of the Plaintiff's mental and emotional trauma and distress, with physical manifestations.

293)     The mental and emotional trauma and distress sustained by the Plaintiff was of such nature that a reasonable person would have suffered emotional distress, with physical manifestations, under the circumstances.

294)     As a direct and proximate cause of Defendant Nicolet's negligent infliction of mental and emotional trauma and distress, the Plaintiff has suffered physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, to his detriment.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant him the following relief:

A)      determine, find and adjudge that Defendants are liable for their violations of law, and award the Plaintiff his actual losses and damages, together with his general, special and compensatory damages and other damages, injuries and losses, and together with costs, attorneys' fees and interest, against the Defendants, jointly and/or severally, as set out herein;

B)      determine and award the Plaintiff, his losses and damages for his physical injuries, pain and suffering, mental and emotional trauma and distress, loss of earning capacity, medical and/or health-related expenses, and general, special and consequential damages, and other damages, injuries and losses, and together with costs, attorneys' fees and interest, as a result of the Defendants' violations of law, jointly and/or severally, as set out herein;

C)      award the Plaintiff his costs in bringing this action, including the filing fees, investigator expenses, expert and witness fees, costs and expenses, and reasonable attorneys' fees;

D)      award the Plaintiff multiple or punitive damages in an amount to be determined;

E)      determine and award the Plaintiff declaratory relief and judgment, as may be just, appropriate, necessary and/or proper;

F)      grant, order, restrain and enjoin the Defendants, jointly and severally, temporarily, preliminarily and permanently, and grant the Plaintiff such equitable relief, as may be just, appropriate, necessary and/or proper; and/or

G) 	any additional relief which this Honorable Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

Respectfully Submitted,
PLAINTIFF, Mark S. Bonchek

By his Attorneys,


_/s/ Philip M. Giordano_____
Philip M. Giordano, Esq.
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email:  pgiordano@reedgiordano.com

Dated: January 6, 2020

## CERTIFICATE OF SERVICE

      I, Philip M. Giordano, do hereby certify that on this 6th day of January 2020, I caused to be a true copy of the foregoing to be emailed to co-counsel for the Plaintiff, and to counsel for the Nicolet Defendants, and to be mailed, first class mail, postage prepaid, to counsel for the Nicolet Defendants, as follows:

Jeffrey R. Tone, Esq.
KATTEN & TEMPLE, LLP
The Rookery Building
209 South LaSalle Street, Suite 950
Chicago, Illinois 60604
Telephone: (312) 663-4400
Facsimile: (312) 663-0900
Email: jtone@kattentemple.com

Laurie J. McLeRoy, Esq.
Stacy C Gerber Ward, Esq.
J. Ryan Maloney, Esq.
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Ste. 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 221-6609
Email: sgward@vonbriesen.com
Email: mcleroy@vonbriesen.com
Email:rmaloney@vonbriesen.com

*/s/ Philip M. Giordano*

Dated: January 6, 2020        Philip M. Giordano